COMMONWEALTH *vs.* HAROLD FAY.

Hampden. December 5, 2013. - March 21, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Sex Offender. Open and Gross Lewdness and Lascivious Behavior. Evidence,*
*Sex offender. Due Process of Law, Sex offender, Substantive rights.*
*Constitutional Law, Sex offender. Words,* "Menace," "Mental abnormality."

This court concluded that a criminal defendant who is the subject of a petition
for civil commitment as a sexually dangerous person may be determined to
be a "menace" to the health and safety of others within the meaning of
G. L. c. 123A even where he is likely to commit only noncontact sexual
offenses [580-582]; therefore, at the trial on a petition to commit the
defendant civilly as a sexually dangerous person, the evidence was suf-
ficient to find that the defendant suffered from a mental abnormality that
rendered him a "menace" to the health and safety of others, despite the
judge's finding that the defendant was likely to commit only noncontact
offenses in the future, where the evidence showed that the defendant was
likely to target children, and where the predicate offenses included luring
behavior, approaching behavior, or both, and thus, the defendant's past and
predicted behavior was highly likely to instill in his future victims the
reasonable apprehension of being subject to a contact sexual offense
[582-583]; further, this court concluded that, in the circumstances, commit-
ting the defendant civilly did not violate his right to substantive due
process under the United States Constitution [583-586].

PETITION for civil commitment filed in the Superior Court
Department on March 24, 2011.

The case was heard by *Mary-Lou Rup,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*John Fennel,* Committee for Public Counsel Services, for the
defendant.

*Katherine A. Robertson,* Assistant District Attorney, for the
Commonwealth.

CORDY, J. On October 15, 2012, at the conclusion of a jury-
waived trial, the defendant was found to be a sexually dangerous
person and committed to the Massachusetts Treatment Center

pursuant to G. L. c. 123A, § 14 (*d*). In support of her decision, the trial judge found that the defendant suffered from pedophilia and exhibitionism and that he was likely to reoffend against children. She further found that, although the defendant was only likely to commit noncontact sexual offenses, such as open and gross lewdness, in the future, these offenses would "instill in his child victims a reasonable apprehension of being subjected to a contact sex offense," particularly where the defendant's actions in the past exhibited luring, approaching, and confining behavior. Thus, she held that the defendant was a "menace" as defined by this court in *Commonwealth* v. *Suave*, 460 Mass. 582, 588 (2011), and ordered him civilly committed.

On appeal, the defendant first argues that the evidence was insufficient to support a finding that he is a "menace" to the health and safety of others. He contends that the judge improperly considered evidence that he exhibited "confining" behavior based on a criminal charge of which he was acquitted, and that if his "confining" behavior had not been considered, evidence that he lured or approached the children he targeted would have been insufficient. He further argues that, as a matter of law, he cannot be categorized as a sexually dangerous person within the meaning of G. L. c. 123A, where he is not likely to commit contact sex offenses in the future. Finally, he argues that, if his actions do fall within the statute, his commitment violates his right to substantive due process because he cannot be considered sufficiently "dangerous" absent predicted violent conduct.

We conclude that the evidence was sufficient to prove that the defendant was a menace to the health and safety of others, and a sexually dangerous person within the meaning of G. L. c. 123A. We also conclude that the defendant's commitment as a sexually dangerous person does not violate his substantive due process rights, where his likely future sexual misconduct would instill in his victims a reasonable apprehension of being subjected to a contact sex offense.

1. *Prior offenses.* The Commonwealth moved to commit the defendant as a sexually dangerous person based on six prior convictions of "[s]exual offenses" under G. L. c. 123A, § 1, occurring during four incidents over a fifteen-year period, each involving children under the age of fourteen. We briefly sum-

marize the facts of these convictions as presented to the judge at trial.

a. *The Athol offense.* On November 3, 1995, the victim, a thirteen year old boy, was at the defendant's house, where, the victim alleged, the defendant showed him a sexually explicit movie. He further alleged that the defendant asked him to unzip his pants, and when he refused, the defendant backed him into a corner while continuing to beg him to expose his penis. The victim finally exposed his penis. The defendant then exposed his penis to the victim to show him his scars. When the victim began to leave, the defendant said, "No." He then gave the victim candy and asked, "You're not going to tell anyone, are you?" After finally leaving the house, the victim went home, and "kept praying and praying."

The defendant was convicted of one count of open and gross lewdness and sentenced to two and one-half years in a house of correction, with thirty days to be served and the balance suspended for a five-year probationary period.[1] Conditions of probation required that he undergo sex offender evaluation and treatment[2] and that he have no unsupervised contact with children.

b. *The Westfield offense.* In June, 1999, the defendant visited the home of his daughter, her fiancé, and her four children. At some point, he entered the bedroom his eleven year old granddaughter shared with her nine year old sister and woke both girls. He knelt at their bedside, looking at them and then at his penis. He began to touch his penis, and the granddaughter believed he was trying to get the girls to look at it as well.

Later that same day, his granddaughter was sitting in his truck, pretending to drive it. The defendant got into the truck and sat beside her in the passenger seat. He engaged her in sexually explicit conversation and offered to show her his penis. He then told her that his penis was erect, and asked her to look away as he masturbated.

---

[1]The victim also alleged that the defendant engaged in oral sex with him. Accordingly, the defendant was charged with rape of a child, but was found not guilty on that charge.

[2]The defendant participated in approximately nine months of group therapy for sexual offenders, maintaining throughout that he had never committed a sexual offense.

The victim asked him if she could leave and the defendant said, "No," as others "would think something strange was going on." The defendant gave her a fire extinguisher box and instructed her to look at it while he masturbated. She eventually looked at the defendant, saw his hand on his penis, and noticed that he had ejaculated into a garbage bag. She later disclosed this incident to her mother, crying hysterically as she did so.

In 2001, the defendant pleaded guilty to one count of open and gross lewdness and one count of indecent exposure relating to these incidents. He was sentenced to six months in a house of correction, to be followed by ten years of probation, which required him to undergo sex offender evaluation and treatment and to have no contact with children under the age of sixteen unless properly supervised.[3]

c. *The Rutland offense.* At some point between September 4 and 6, 1999, three girls, aged from ten to eleven, saw the defendant sitting on a cooler as they walked through a campground. He was wearing shorts, with his legs apart, and his penis exposed. The defendant watched the girls pass by, and minutes later he followed them on a trail.

On a subsequent day, the girls saw the defendant walk past them, and he again sat down with his legs apart and his penis exposed under the leg of his shorts. Disturbed, the girls began to leave the area. As they left, he called to them, handed them an empty cigarette pack, and asked them to get cigarettes for him from his wife. As they approached, they again saw his penis exposed. Afraid, the girls declined to get cigarettes for him. As they walked away, they saw the defendant staring at them while touching his penis. In reporting the incident, the girls all said that they were scared by the events, and one of the girls reported that she was unable to eat for three days.

In 2001, the defendant pleaded guilty to three charges of open and gross lewdness. He was sentenced to from two and one-half to three years' imprisonment, to be followed by ten years of probation, which required that he undergo sex offender evaluation and treatment and have no contact with children under sixteen without supervision.

---

[3]The defendant violated his probation in 2010.

d. *The Winchendon incidents.* On October 20, 2010, the defendant visited an acquaintance at her home, where she lived with the victim, her eight year old daughter. The victim told police that the defendant had exposed himself to her twice that day. When the victim and her cousin went outside to tie up the family dog, the defendant followed, staring at both of them. The victim ran back into the house in tears, and her mother saw the defendant standing in the doorway with his penis exposed. Later, the defendant sat behind the victim as she used the computer in her mother's bedroom, while her mother lay in bed. When the victim turned around, she saw the defendant touching his exposed penis.

The defendant pleaded guilty to open and gross lewdness. He was sentenced to six months in a house of correction, to be served concurrently with the sentence he was already serving for violating his probation.[4]

2. *Expert testimony.* At trial, the Commonwealth presented testimony from two qualified experts, Dr. Gregg A. Belle and Dr. Katrin Rouse Weir, both of whom testified that the defendant met the definition of a sexually dangerous person. Both doctors opined that the defendant suffered from pedophilia and exhibitionism; that both conditions met the definition of "mental abnormality" under G. L. c. 123A, § 1; and that due to that mental abnormality, the defendant was highly likely to reoffend through noncontact sexual offenses such as open and gross lewdness. Dr. Rouse Weir further opined in her qualified examiner's report (and during her testimony) that the defendant's "predicted sexual offenses," even if noncontact in nature, would cause children, "due to their lack of experience and sophistication, . . . to experience fear of an imminent sexual offense by experiencing an adult acting in a sexual manner directed at them."

---

[4]The judge also heard evidence of, but expressly declined to consider, two other sexual offenses. First, evidence was presented that the defendant may have been convicted of assault with intent to rape in 1960. The court also heard evidence that the defendant's daughter reported to police that, when she was seventeen years of age, he fondled her breasts, offered to "satisfy" her sexually, and asked her whether she minded if he watched pornography and masturbated in front of her and whether she wanted to "help." She also alleged that he molested her sister when she was fourteen years of age.

The defendant presented testimony from two experts, Dr. Leonard Bard and Dr. Joseph Plaud. Both opined that, while the defendant would likely reoffend, he was unlikely to commit contact sexual offenses. Therefore, they both determined that he did not meet the statutory definition of "sexually dangerous person."[5]

3. *The judge's findings.* The judge determined that the Commonwealth had proved that the defendant was a sexually dangerous person.[6] She first found that the defendant had clearly been convicted of predicate sexual offenses. Next, she found that the defendant suffered from the mental abnormalities of both pedophilia and exhibitionism, noting that he had "a demonstrated history of offending with prepubescent children for a fifteen-year period between 1995 and 2010, in four separate instances." She further determined that, as a result of those mental abnormalities, he was likely to commit future criminal, but noncontact, sexual acts.

The judge found that the defendant's mental abnormality, and his predisposition to commit criminal sexual acts, made him a menace to the health and safety of other persons. She noted that the defendant's actions elicited fear, hysteria, crying, and a loss of appetite in his victims, and that, in all of the incidents, the defendant exhibited luring behavior, approaching behavior, or both toward his young victims. She also considered that the defendant exhibited confining behavior in the 1995 Athol incident, where the defendant was accused of cornering a thirteen year old boy and asking him to expose his penis.

Finally, the judge found that, if not confined, the defendant was likely to commit noncontact sexual offenses "involving exposing himself and masturbating in front of children," and

---

[5] Dr. Leonard Bard "provisionally" diagnosed the defendant with pedophilia and exhibitionism. Dr. Joseph Plaud diagnosed the defendant only with exhibitionism.

[6] "In order to find the defendant a 'sexually dangerous person,' the Commonwealth must prove three things: (1) the defendant has been convicted of a '[s]exual offense,' as defined in G. L. c. 123A, § 1; (2) he suffers from a '[m]ental abnormality' or '[p]ersonality disorder,' as those terms are defined in § 1; and (3) as a result of such mental abnormality or personality disorder, the defendant is 'likely to engage in sexual offenses if not confined to a secure facility.' " *Commonwealth* v. *Suave,* 460 Mass. 582, 584 n.3 (2011), quoting G. L. c. 123A, § 1 (definition of "[s]exually dangerous person").

that his reoffending would "instill in his child victims a reasonable apprehension of being subjected to a contact sex offense." She therefore ordered him committed pursuant to G. L. c. 123A, § 14 (*d*).

4. *Discussion.* A defendant may be committed as a sexually dangerous person if he has been convicted of a sexual offense, suffers from a mental abnormality or personality disorder that renders him a menace to the health and safety of others, and is likely to engage in sexual offenses if not confined. G. L. c. 123A, §§ 1, 14. There is no doubt that the first and third elements of the Commonwealth's case were met, where the evidence showed that the defendant had committed, and would continue to commit, noncontact sexual offenses. We must thus determine first whether the defendant, as a matter of law, suffers from a "mental abnormality" that renders him a menace, as defined in the statute, and, if so, whether civil commitment is permissible under the substantive due process protections of the United States Constitution where his mental abnormality renders him likely to commit only noncontact offenses in the future.

a. *Sufficiency of the evidence.* The defendant argues that the evidence was insufficient to find that he suffered from a mental abnormality that rendered him a "menace" under G. L. c. 123A because the judge found that he was likely to commit only noncontact sex offenses in the future.

The determination whether the defendant suffers from a "mental abnormality" contains both medical and legal aspects. *Commonwealth* v. *Suave*, 460 Mass. at 587. It is indisputable that the defendant suffers from, at the very least, exhibitionism, which is sufficient to satisfy the medical aspect. See *id.* (medical aspects not in dispute where defendant suffered from exhibitionism, which predisposed him to commit open and gross lewdness and lascivious behavior). Here, as in *Suave*, "[t]he legal aspect of this element, whether the defendant's disorder makes him 'a menace to the health and safety of other persons,' is at the heart of this case." *Id.*

"The term 'menace,' as it is used in the definition of '[m]ental abnormality' in G. L. c. 123A, § 1, and as that term is used in the definition of '[s]exually dangerous person,' which requires proof of the likely commission of a 'sexual offense,' connotes a

person whose conduct will objectively put his victim in fear of bodily harm by reason of a battery and, specifically, a contact sex crime." *Id.* at 588. Open and gross lewdness — the defendant's predicate and predicted offense — is defined as a "sexual offense" under G. L. c. 123A, § 1. Thus, "the Commonwealth must show the defendant's predicted [open and gross lewdness] will instill in his victims a reasonable apprehension of being subjected to a contact sex crime." *Id.*

In *Suave*, 460 Mass. at 588, we held that "the manner in which the defendant would likely commit a future 'sexual offense,' i.e., open and gross lewdness and lascivious behavior, would not render him a 'menace' " where "the judge found no evidence that the defendant had ever stalked, lured, approached, confined, or touched a victim, that there was no reason to believe he would target children, and that there was no reason to believe the defendant's future sexual offenses would escalate into contact offenses." We did not need to decide whether all sex offenders "who are likely to commit only noncontact sexual offenses in the future are not menaces to the health and safety of other persons," noting that "[e]ach case is fact specific," and that "[w]e [could] easily envision a case where the outcome might be different, based on the specific behavior of a particular defendant." *Id.* at 589.

We now hold that a defendant may be determined to be a "menace" where he is likely to commit only noncontact sexual offenses. Such a determination turns not on whether he would have the subjective intent to cause harm in engaging in future sex offenses or to engage in a contact sex offense, but on the reasonably expected harm to his prospective victims,[7] specifically, whether the defendant's predicted offenses "will instill in his victims a reasonable apprehension of being subjected to a contact sex crime." *Id.* at 588. Thus, a defendant who is predicted to

---

[7]Hence, the defendant's argument that *Commonwealth* v. *Gorassi*, 432 Mass. 244 (2000), controls is misplaced. In that case, we held that the evidence was insufficient to show assault with intent to commit a felony where the defendant followed two girls, approached them, and enticed them to follow him, because there was no evidence that he threatened or intended to use force in getting them to follow him. *Id.* at 249-250. Our focus is not on the subjective intent of the defendant, but on the fear that is likely, objectively, to be elicited from a prospective victim, here, a child.

engage in exclusively noncontact offenses may be found to be a sexually dangerous person under G. L. c. 123A.

Because we have determined that the judge was not precluded from finding the defendant to be sexually dangerous, we turn to whether the evidence was sufficient to permit her to do so. While the Commonwealth was unable to show that the defendant was a "menace" in *Suave*, the evidence in the present case fully supports the judge's finding that the defendant was sexually dangerous. The evidence showed that the defendant was likely to target children. Two experts diagnosed the defendant with pedophilia, opining that he showed deviant sexual arousal for prepubescent children under the age of thirteen. Both Dr. Belle and Dr. Rouse Weir testified that the defendant had targeted prepubescent children in the past and would likely continue to do so.

Further, all of the predicate offenses here included either luring behavior, approaching behavior, or both.[8] Just as the lack of such behavior in *Suave* influenced our decision that the defendant was not a menace, the presence of this behavior tends to show that his actions sufficed to find him menacing under the statute. Most importantly, the defendant's past and predicted behavior was highly likely to instill in his future victims the reasonable apprehension of being subjected to a contact sexual offense. Where, as here, the prospective victims are children, the judge should consider whether a child, and not an adult person, reasonably would be placed in fear of contact sexual offense by the defendant's actions. "When the victim [of a crime of open and gross lewdness] is a child, there is arguably a greater risk of harm due to the child's immaturity, lack of experience, natural tendency to fantasize, and presumed ignorance of sexual matters." *Commonwealth* v. *Kessler*, 442 Mass. 770, 777 (2004). In Athol, the defendant showed the victim the scars on his penis and rebuffed the victim's desire to leave. The victim spent the night "praying and praying," and was shocked and

---

[8] The judge also considered that the Athol offense included confining conduct, where the defendant was alleged to have cornered his victim and exposed his penis. It was not error for the judge to consider the circumstances attendant to the open and gross lewdness offense of which the defendant was convicted, even where he was acquitted of the more serious charge of rape of a child. See *Commonwealth* v. *Given*, 441 Mass. 741, 747 (2004).

scared when he recounted the incident. In Rutland, the defendant watched and followed the three victims and twice exposed his penis to them. As they began to walk away from him, he beckoned them to come to him, his penis exposed throughout. In Westfield, the defendant approached his grandchildren in their bedroom and exposed himself. He also approached his granddaughter as she sat in his truck, told her not to leave so as not to arouse suspicion, and masturbated to ejaculation while sitting only a few feet away from her. The victim cried hysterically as she recounted the incident. Finally, in Winchendon, the defendant followed the victim and her cousin outside while staring at them. He then exposed himself and caused the victim to run into the house crying. He also sat behind the victim rubbing his penis as she used her computer.

The judge's conclusion that the defendant's conduct in future offenses would cause a child reasonably to fear that he or she was likely to be the victim of a contact sexual offense is amply supported by the record. There was no error in the judge's determination that the defendant is a sexually dangerous person.

*b. Substantive due process.* The defendant next argues that civilly committing him violates his right to substantive due process under the United States Constitution where he is unlikely to commit a contact sexual offense. We disagree, at least in the circumstances present here.[9]

Substantive due process precludes the government from "engaging in conduct that 'shocks the conscience' . . . or interferes with rights 'implicit in the concept of ordered liberty' " (citations omitted). *Commonwealth* v. *Bruno*, 432 Mass. 489, 503

---

[9]The defendant contends that this issue is preserved because trial counsel put the judge on notice of a challenge to the constitutionality of G. L. c. 123A by mentioning the *Suave* case in closing. We decided *Suave* on the grounds that the defendant was not a "menace" under the statute, and did not reach the constitutional issue. *Suave*, 460 Mass. at 587. Taken in context, trial counsel was clearly arguing that a noncontact offender could not be a "menace" under G. L. c. 123A, not addressing the constitutional issue. Thus, the issue was waived. See *Rodwell* v. *Commonwealth*, 432 Mass. 1016, 1018 (2000) ("If a defendant fails to raise a claim that is generally known and available at the time of trial or direct appeal or in the first motion for postconviction relief, the claim is waived"). However, we will address the issue, which has been fully briefed, in order to determine whether there was a substantial risk of a miscarriage of justice.

(2000). "[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington* v. *Texas*, 441 U.S. 418, 425 (1979). See *Bruno*, *supra* at 502, quoting, *Commonwealth* v. *Travis*, 372 Mass. 238, 250 (1977) ("While commitment proceedings under c. 123A are civil proceedings, the potential deprivation of liberty to those persons subjected to these proceedings 'mandates that due process protections apply' "). "Therefore, a State must have 'a constitutionally adequate purpose for the confinement.' " *Jones* v. *United States*, 463 U.S. 354, 361 (1983), quoting *O'Connor* v. *Donaldson*, 422 U.S. 563, 574 (1975).

Substantive due process is not violated by statutes that provide for the "forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety," as long as "the confinement takes place pursuant to proper procedures and evidentiary standards." *Kansas* v. *Hendricks*, 521 U.S. 346, 357 (1997). Thus, civil commitment statutes are permissible where the Legislature has "coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' " *Id.* at 358, quoting *Heller* v. *Doe*, 509 U.S. 312, 314-315 (1993).

In both the *Hendricks* case and *Kansas* v. *Crane*, 534 U.S. 407, 409-410 (2002), the United States Supreme Court upheld a statute similar to G. L. c. 123A in the face of constitutional challenges.[10,11] The Court held in *Crane*, *supra* at 409-410, quoting *Hendricks*, *supra* at 357-358, that it has " 'consistently upheld such involuntary commitment statutes' when (1) 'the confinement takes place pursuant to proper procedures and evi-

---

[10]Kansas Stat. Ann. § 59-29a02 (1994) (Kansas Sexually Violent Predator Act) authorizes the civil commitment of "sexually violent predator[s]," which are defined as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." *Kansas* v. *Hendricks*, 521 U.S. 346, 352 (1997).

[11]In *Hendricks*, 521 U.S. at 356, the United States Supreme Court concluded that the Kansas Sexually Violent Predator Act met substantive due process requirements where it required "mental abnormality" rather than "mental illness" as a prerequisite for commitment. In *Kansas* v. *Crane*, 534 U.S. 407, 411-412 (2002), the Court concluded that "total or complete lack" of control over a person's offending, due to mental illness or abnormality, was not constitutionally required for commitments.

dentiary standards,' (2) there is a finding of 'dangerousness either to one's self or to others,' and (3) proof of dangerousness is 'coupled . . . with the proof of some additional factor, such as a "mental illness" or "mental abnormality." ' "[12] A prediction of future dangerousness is a necessary prerequisite for civil commitment. *Hendricks, supra* at 360.

The defendant does not appear to challenge the first and third prongs of the *Hendricks* test. It is uncontested that G. L. c. 123A outlines proper procedures and evidentiary standards,[13] and we have determined that the evidence was sufficient to establish that the defendant suffered from a mental abnormality. Therefore, his argument centers on whether his right to substantive due process is violated where his commitment is based on the likelihood that he will commit only noncontact offenses in the future.

While this question is one of first impression, we do not need to define the outer contours of what either the Federal or Massachusetts Constitution would permit with respect to the commitment of individuals found to be sexually dangerous in order to resolve it. An individual who is likely to engage in noncontact sexual offenses directed at children in a manner that would place them in reasonable apprehension of being the victim of a

[12]The Kansas Sexually Violent Predator Act includes, as predicate sexually violent offenses, noncontact crimes such as indecent solicitation of a child. Although the inclusion of noncontact offenses was not at issue in either the *Hendricks* case or the *Crane* case, as indicated in note 11, *supra*, the Court upheld that constitutionality of the Kansas statute. While the defendant's argument that he would not qualify for commitment under the Kansas statute is technically accurate, it is misplaced. The defendant could not be committed under that statute because open and gross lewdness would not qualify as a predicate offense, not because he is unlikely to commit contact sexual offenses.

[13]After the civil commitment process is initiated by the district attorney, a defendant has the right to a probable cause hearing, where he is entitled to the assistance of counsel. G. L. c. 123A, § 12 (*c*), (*d*). If the judge finds probable cause to believe that the defendant is a sexually dangerous person, he is committed to a treatment center to be examined by two qualified examiners and any examiners of his choosing. G. L. c. 123A, § 13 (*a*), (*d*). If at least one of the examiners concludes that the defendant is a sexually dangerous person, the defendant has a right to a jury trial, where he is again entitled to counsel and expert witnesses. G. L. c. 123A, § 14 (*a*), (*b*). If the trier of fact finds, beyond a reasonable doubt, that the defendant is sexually dangerous, he is committed and has the right to petition for examination and discharge every twelve months, pursuant to G. L. c. 123A, § 9, at which point the Commonwealth must again prove the defendant's dangerousness. G. L. c. 123A, § 14 (*d*).

contact sexual offense plainly engages in conduct dangerous to their health, safety, and well-being. Protecting children from exposure to such conduct by persons suffering from a mental disorder who, as a consequence, are likely to engage in the conduct falls well within constitutional boundaries. See *New York* v. *Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance"); *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596, 607 (1982) ("safeguarding the physical and psychological well-being of a minor" is "compelling" interest).

The judge's order committing the defendant pursuant to G. L. c. 123A is affirmed.

*So ordered.*