NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12173

COMMONWEALTH  vs.  RICHARD GEORGE.


Worcester.     December 8, 2016. - June 21, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, & Budd, JJ.


Sex Offender.  Constitutional Law, Sex offender.  Due Process of
    Law, Sex offender, Substantive rights.  Evidence, Sex
    offender, Expert opinion, Relevancy and materiality.
    Witness, Expert.



Civil action commenced in the Superior Court Department on
October 11, 2013.

The case was tried before Beverly J. Cannone, J.

The Supreme Judicial Court granted an application for
direct appellate review.


David B. Hirsch for the defendant.
Nathaniel R. Beaudoin, Assistant District Attorney, for the
Commonwealth.


HINES, J.  After a jury trial in the Superior Court, the

defendant, Richard George, was determined to be a sexually

dangerous person (SDP) pursuant to G. L. c. 123A.  In accordance

with the statute, the judge committed the defendant to the

Massachusetts Treatment Center (treatment center) for an indeterminate period of from one day to life. The defendant filed a timely appeal challenging the commitment on the grounds that (1) a diagnosis of antisocial personality disorder (ASPD) is a constitutionally inadequate basis for commitment as an SDP; and (2) the judge erroneously admitted expert opinion testimony on the likelihood of reoffense and the results of the Static-99R risk assessment tool. We allowed the defendant's application for direct appellate review to clarify the relevance of an ASPD diagnosis in the sexual dangerousness calculus.

We conclude that an ASPD diagnosis is a sufficient predicate for sexual dangerousness so long as other evidence establishes a nexus between that condition and the factors warranting confinement to a secure facility. Also, we discern no error in the judge's evidentiary rulings requiring reversal. Therefore, we affirm the judgment and order for the defendant's civil commitment to the treatment center as an SDP.

Background. 1. Pretrial proceedings. In October, 2013, the Commonwealth filed a petition pursuant to G. L. c. 123A, § 12, seeking an adjudication that the defendant is an SDP. In April, 2014, a Superior Court judge found probable cause to believe that the defendant is an SDP and committed him to the treatment center for examination and diagnosis. Two qualified

examiners[1] submitted reports, opining that the defendant is an SDP within the meaning of G. L. c. 123A, § 1. The trial on the Commonwealth's petition commenced in September, 2015.

2. The trial. Through records admitted at trial pursuant to G. L. c. 123A, § 14 (c), and the testimony of the two qualified examiners, the Commonwealth presented evidence from which the jury could have found beyond a reasonable doubt the statutory elements necessary for the defendant's commitment as an SDP. This evidence detailed the defendant's prior convictions of sexual offenses and included expert opinion testimony on two issues: (1) whether the defendant suffered from a mental abnormality or personality disorder that predisposes him to commit sexual offenses; and (2) whether the defendant likely would reoffend because of that mental condition if not confined to a secure facility. The defendant offered no evidence at trial.

The jury could have found the following facts. The defendant was convicted of two different sexual offenses as defined in G. L. c. 123A, § 1. In 1978, when the defendant was

---

[1] "A qualified examiner is either (1) a physician who is licensed by the Commonwealth and certified or eligible to be certified in psychiatry by the American Board of Psychiatry and Neurology; or (2) a psychologist who is licensed by the Commonwealth. In all cases, a qualified examiner is designated as such by the Department of Correction and has at least two years of experience with diagnosis or treatment of sexually aggressive offenders." Green, petitioner, 475 Mass. 624, 625 n.3 (2016), citing G. L. c. 123A, § 1.

seventeen years of age, he sexually assaulted a nine year old girl. After first going down a bike path with the victim's eleven year old sister, the defendant asked the victim if she too wanted to go down the bike path. As they went down the path, the defendant pushed the victim down to the ground, got on top of her, and, over the victim's clothing, fondled her breasts and genital area.

After the victim began to scream for her sister, the defendant let her get up from the ground and warned if she told anyone, she would be killed. Thereafter, the defendant was charged and convicted of indecent assault and battery on a child under the age of fourteen. Following conviction, the defendant was sentenced to a term of probation for three years.

Approximately twelve years later, the defendant was convicted of aggravated rape and rape. The convictions stemmed from the rape of a forty-nine year old woman, who was the mother of a woman the defendant had dated previously. The defendant went to the victim's home and asked to speak with her daughter, who was not home. Following a conversation with the victim, the defendant asked if he could use her restroom. He reported to the victim that the toilet was not functioning. When the victim went to investigate, the defendant attacked her. Putting his hands around her throat, the defendant pulled the victim down to the floor and sexually assaulted her vaginally and anally.

After sexually assaulting the victim, the defendant physically assaulted her with an iron and a knife.  The victim sustained a broken jaw, a fractured skull, and a cut on her neck.

Based on the sexual and physical assault, the defendant was convicted of several rape charges, including one count of aggravated rape and two counts of rape.  As a result of the aggravated rape conviction, the judge sentenced the defendant to imprisonment for a term of from fifteen to twenty-five years.

At trial, the Commonwealth presented evidence from the two qualified examiners, Gregg A. Belle, Ph.D., and Dr. Katrin Rouse-Weir, Ed.D.  Both qualified examiners interviewed and diagnosed the defendant with ASPD, and agreed that this particular mental condition constituted a personality disorder as defined by G. L. c. 123A, § 1.  In support of the diagnosis, the examiners considered a range of factors, including the defendant's disciplinary history while incarcerated, his history of sex offender treatment, and statements the defendant made in other evaluations regarding his sexual offenses.  Dr. Belle characterized the defendant's incarceration and disciplinary history as "somewhat difficult."  Specifically, the defendant received approximately fifty-three disciplinary reports alleging violations of prison rules, some of which resulted from threatening and sexually explicit statements the defendant allegedly made to female staff.  Another disciplinary report

resulted from an incident where the defendant masturbated in front of a female correctional officer. The defendant's sexually threatening and explicit behavior was a factor in his transfer to a higher security facility.

Although the defendant participated in sex offender treatment, he was terminated from the treatment program on several occasions. He was terminated on one occasion because of sexually explicit letters he wrote to female staff. The defendant also made sexually threatening statements regarding his plans on release, warning that he was going to commit a rape when he was released from prison and identifying the female staff member that he planned to rape. In 2006, the defendant was again terminated from the treatment program for engaging in consensual oral sex with a wheel-chair bound inmate.

Considering the defendant's criminal sexual history together with the nature of the numerous violations of institutional rules, Belle explained that this conduct exemplified "one of the hallmark traits of an antisocial personality disorder." Belle also concluded that the defendant has demonstrated, "over a period of time, a persistent pattern . . . [of] an inability to control his sexual impulses." According to Belle, the defendant's continued engagement in a "pervasive pattern" of sexually threatening behavior while incarcerated, "speak[s] to the statutorily defined personality

disorder" that he characterized as ASPD.  Similarly, Dr. Rouse-Weir noted that the statements made to female staff "involved sexual aggression, which is relevant . . . with regard to his risk."  Rouse-Weir went on to note that the defendant's aggression, irritability, lack of remorse, and lack of regard for the rights of others had "a sexual element."  She added that the continued demonstration of aggression with sexualized elements directed toward female staff exclusively was a "chronic characteristic associated with [his ASPD]."

Belle and Rouse-Weir also opined on the significance of the defendant's score on the Static-99R risk assessment tool.[2]  The Static-99R risk analysis completed by Belle yielded a score of four, which Belle opined translated to a "moderate-high" risk to sexually reoffend.  Belle also explained that a score of four corresponded to an eleven per cent risk that the defendant would reoffend sexually over a five-year period.  Rouse-Weir, on the other hand, opined that the defendant's Static-99R risk analysis yielded a score of six, which falls within the "high-risk category" as defined by the Static-99R.

---

[2] The Static-99R is an actuarial tool, designed to predict the recidivism risk of sexual offenses in adult male sex offenders who have been convicted of at least one sexual offense.  See Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 636 n.33 (2011). Initially developed in 1999, the Static-99 has since been revised and renamed "Static-99R."

Discussion.  The defendant challenges the commitment, arguing that commitment as an SDP based on an ASPD diagnosis violates substantive due process and that the erroneous admission of expert opinion testimony on the likelihood of reoffense and the scores on the Static-99R predicting a "moderate high" or "high" risk of reoffense usurped the jury's role as fact finder.  We address both arguments in turn.

1.  Antisocial personality disorder.  Raising the issue for the first time on appeal,[3] the defendant claims that commitment as an SDP based on an ASPD diagnosis as the predicate mental condition violates substantive due process.  Borrowing from the United States Supreme Court's analysis of a civil commitment statute in Kansas v. Crane, 534 U.S. 407 (2002), the defendant contends that the use of the ASPD diagnosis sweeps too broadly, permitting what amounts to unconstitutional preventive detention.  As the argument goes, the ASPD diagnosis fails to distinguish "the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted

---

[3] Although the defendant raised this argument in a motion in limine, defense counsel withdrew the motion prior to the start of trial.  Also, the defendant did not object to the antisocial personality disorder (ASPD) diagnosis at trial or move for a directed verdict.  Thus, the issue is waived.  However, we address the issue to determine whether the admission of the evidence created a substantial risk of a miscarriage of justice. See Commonwealth v. Fay, 467 Mass. 574, 583 n.9, cert denied, 135 S. Ct. 150 (2014).

in an ordinary criminal case." Id. at 413. We reject the defendant's argument as it misapprehends the evidentiary weight to be accorded to an ASPD diagnosis in the sexual dangerousness calculus.

The definition of an SDP in G. L. c. 123A, § 1, makes it abundantly clear that an ASPD diagnosis, standing alone, does not justify commitment as an SDP. An SDP is defined as any person "who has been . . . convicted of . . . a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility."[4] A "personality disorder" is defined as "a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses." Id. Although we have not been called on to parse the definition of "personality disorder," the Appeals Court has correctly recognized ASPD as a type of personality disorder, which in conjunction with other relevant evidence, may justify commitment as an SDP. See, e.g., Souza, petitioner, 87 Mass. App. Ct. 162, 169 (2015) (noting that ASPD diagnosis is "adequate to satisfy the definitional requirements of an SDP in G. L. c. 123A, § 1"); Commonwealth v. Husband, 82 Mass. App. Ct. 1, 5 (2012) (same); Commonwealth v. Mazzarino, 81

---

[4] The Commonwealth does not contend that the defendant suffered from a "mental abnormality."

Mass. App. Ct. 358, 369 (2012) (commitment based on ASPD diagnosis "combined with other evidence" suggesting ASPD made respondent likely to reoffend sexually if not confined does not violate due process protections under Fourteenth Amendment to United States Constitution or art. 12 of Massachusetts Declaration of Rights).

Accordingly, a "personality disorder" as defined in G. L. c. 123A, § 1, is relevant to the sexual dangerousness calculus only if the "condition . . . results in a general lack of power to control sexual impulses."  Contrary to the defendant's assertion, our law does not permit the indefinite and indiscriminate commitment of persons solely because of an ASPD diagnosis.  The diagnosis requires an individualized review, and it is relevant only if it is predictive of a lack of control over the proclivity for criminal conduct and the conduct is likely to be sexual in nature.  Not all offenders diagnosed as having ASPD can be so categorized.  Instead, our cases have held true to the underlying statutory purpose to subject only those persons who because of a prescribed mental condition cannot control their impulses to commit a sexual crime to the possibility of civil commitment as an SDP.[5]

---

[5] The defendant urges this court to follow the reasoning in Matter of State of N.Y. v. Donald DD, 24 N.Y.3d 174, 190 (2014) (ASPD diagnosis alone absent diagnosis of any other "condition, disease or disorder alleged to constitute a mental abnormality"

Here, two qualified examiners opined that the defendant suffered from ASPD and determined that because of this condition the defendant was likely to engage in sexual offenses if not confined in a secure facility. The qualified examiners did not base their opinion on this diagnosis alone. Rather, they also relied on evidence, separate and apart from the defendant's criminal history, suggesting that ASPD made the defendant "likely to engage in sexual offenses" if not civilly committed. G. L. c. 123A, § 1. Belle predicated his conclusion that the defendant lacked the ability to control his sexual impulses not only on the defendant's criminal history, but also on his incarceration history. Belle noted that he considered behaviors in which the defendant has engaged as constituting a "persistent pattern in which he has shown an inability to control his sexual impulses." While incarcerated, the defendant had a history of making "physically threatening," "sexually assaulting," and sexually explicit statements directed toward female staff

_____

is insufficient to meet test set out by Supreme Court in Kansas v. Crane, 534 U.S. 407, 413 [2002]). However, we are not persuaded by the court's analysis, which, as the dissent in that case points out, concludes that because ASPD does not, in every case, predispose the individual to commit sex crimes, the diagnosis can never satisfy the definitional requirements of the statute. Id. at 194 (Graffeo, J., dissenting). As we conclude here, G. L. c. 123A requires a determination on a case-by-case basis whether in a given case the ASPD diagnosis meets the definition of an SDP.

members, including threatening to break a woman's leg and threatening to rape another.

Similarly, Rouse-Weir based her conclusion on the defendant's criminal history as well as his incarceration history, including his participation in sex offender treatment programs, and his disciplinary history.  Rouse-Weir noted that the defendant participated in, but failed to successfully complete, sex offender treatment, and received fifty-three disciplinary reports and associated sanctions.  With respect to disciplinary reports, Rouse-Weir, like Belle, pointed out that during the initial period of the defendant's incarceration, his disciplinary reports related to the use of threatening language and sexually aggressive statements toward female staff, which sometimes resulted in the defendant being transferred to higher security facilities.

Both Belle and Rouse-Weir conceded that ASPD affects a large percentage of the ordinary prison population,[6] and that the disorder tends to "burn out or mitigate" once an individual reaches his forties.  However, Rouse-Weir explained that unlike

---

[6] On cross-examination, Belle affirmed ASPD is prevalent in fifty to seventy per cent of the general prison population. Similarly, the United States Supreme Court has noted that an estimated forty to sixty per cent of the male prison population is diagnosable with ASPD.  See Crane, 534 U.S. at 412, citing Moran, The Epidemiology of Antisocial Personality Disorder, 34 Soc. Psychiatry & Psychiatric Epidemiology 231, 234 (1999).

other individuals diagnosed with ASPD, the defendant's lack of
remorse and his lack of regard for others' rights "ha[d] a
sexual element."  Moreover, although Belle determined that the
defendant did not meet the criteria for a paraphilic disorder,[7] a
factor highly relevant to the SDP calculus, Rouse-Weir opined
that the defendant showed "a deviant sexual interest."  This
"deviant sexual interest," combined with the defendant's ASPD,
where it resulted in an inability to control sexual impulses,
was a sufficient predicate for sexual dangerousness.

2.  Qualified examiner testimony.  Prior to trial, the
defendant filed motions in limine to exclude expert opinion
testimony regarding his likelihood of reoffense and to preclude
the admission of "subjective, value judgment labels," for the
scores derived from the Static-99R.  Both motions were denied.
He argues on appeal that the judge erred in denying the motions
because the qualified examiner testimony on both issues
improperly invaded the province of the jury.

a.  Expert testimony regarding likelihood of reoffense.  To
commit a person as an SDP, the jury must determine that the

---

[7] A paraphilic disorder is characterized as recurrent,
intense sexually arousing fantasies, sexual urges, or behaviors
generally involving (1) nonhuman objects, (2) the suffering or
humiliation of oneself or one's partner, or (3) children or
other nonconsenting persons that occur over a period of at least
six months.  Paraphilic disorders as defined in the Diagnostic
and Statistical Manual of Mental Disorders, include, but are not
limited to, exhibitionistic disorder, fetishistic disorder, and
pedophilic disorder.

person has been "convicted of a sexual offense, suffers from a mental abnormality or personality disorder that renders him a menace to the health and safety of others, and is likely to engage in sexual offenses if not confined." Commonwealth v. Fay, 467 Mass. 574, 580, cert. denied, 135 S. Ct. 150 (2014), citing G. L. c. 123A, §§ 1, 14. The defendant correctly concedes that our law allows for expert opinion testimony to "touch on an ultimate issue of the case [where] that testimony aids the jury in reaching a decision." Commonwealth v. MacDonald, 459 Mass. 148, 163 (2011). See Mass. G. Evid. § 704 (2017). Nevertheless, he contends that the qualified examiners' testimony was improper because it would not aid the jury in determining whether the mental abnormality or personality disorder is likely to cause the individual to reoffend unless confined. We disagree.

A qualified examiner's opinion testimony is "the essential basis for a finding of sexual dangerousness." Green, petitioner, 475 Mass. 624, 630 (2016). In an SDP trial, the jury's task involves assessing the risk of reoffending, which in turn involves a complex balance of factors, including "the seriousness of the threatened harm, the relative certainty of the anticipated harm, and the possibility of successful intervention to prevent that harm." Commonwealth v. Boucher, 438 Mass. 274, 276 (2002). "Because the trier of fact in G. L.

c. 123A proceedings must decide '[w]hether a person suffers from a mental abnormality or personality defect, as well as the predictive behavioral question of the likelihood that a person suffering from such a condition will commit a sexual offense,' and because these are 'matters beyond the range of ordinary experience,' expert evidence is required in order to commit a person to the treatment center or to keep a person confined there." Johnstone, petitioner, 453 Mass. 544, 549-550 (2009), quoting Commonwealth v. Dube, 59 Mass. App. Ct. 476, 483 n.12 (2003). See Commonwealth v. Bruno, 432 Mass. 489, 511 (2000).

Thus, the expert's role in opining on the ultimate issue to be decided by the jury is settled in our jurisprudence. The judge did not err in admitting qualified examiner testimony on the ultimate issue. Indeed, given the centrality of expert opinion testimony to the SDP adjudication, it would have been an error of law for the trial judge to exclude that testimony.

b. Static-99R risk category labels. The defendant argues that the admission of the qualified examiners' testimony categorizing his Static-99R score as "moderate-high" and "high" also invaded the jury's province, and thus constituted error. He contends that the Static-99R categories represent a "wholly subjective" assessment and create a risk that the jury will shift responsibility for determining the likelihood of reoffense to the qualified examiners. We conclude that the risk

categories lack probative value in the sexual dangerousness calculus and should not be admitted at trial.

The Static-99R measures ten static risk factors that have been shown to increase one's risk for sexual recidivism, and adjusts the numerical score upwards or downwards depending on risk factors that the qualified examiner determines are significant in the particular individual's case.  See Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 636 n.33 (2011).  Each numeric score corresponds to a percentage reflecting the risk of sexual reoffense and a risk category label ("low," "low-moderate," "moderate-high," and "high").  See Hanson, Babchishin, Helmus, Thornton, & Phenix, Communicating the Results of Criterion Referenced Prediction Measures:  Risk Categories for the Static-99R and Static-2002R Sexual Offender Risk Assessment Tools, 29 Psychological Assessment 582, 584 (2017).

As a threshold matter, the Static-99R is itself a limited tool; it estimates only the "the relative risk of sexual recidivism based on commonly available demographic and criminal history information."  Id.  It does not identify the likelihood of sexual recidivism for a specific individual.  As Belle explained in his testimony, the Static-99R results were not specific to the defendant, and "[o]ne of the cautions about the

Static-99R is that it is looking at groups of individuals that may or may not be similar to [the defendant]."

While the combination of the Static-99R raw score and the corresponding percentage reflecting the risk of sexual reoffense provide "precise, numeric estimates of recidivism risk," the category labels do not.  Id. at 583.  The test's developers have acknowledged that the meaning of risk category labels is often unclear.  "There is only a loose association in natural language between verbal labels for likelihood [e.g., 'low,' 'low-moderate,' 'moderate-high,' and 'high'] . . . and numeric probabilities."  Id.  Further, test developers have conceded that the lack of clarity is exacerbated by the absence of accepted standards or metrics connecting the risk category labels to "specific meanings, such as recidivism rates, psychological features, or expected treatment needs."[8]  Id.  Consequently, "substantial variation" exists among sex offenders ascribed identical risk category labels.  Id.

---

[8] To resolve the shortcomings of the Static-99R risk category labels, test developers have created new risk category labels.  We take no position on the admissibility of those labels.  See Hanson, Babchishin, Helmus, Thornton, & Phenix, Communicating the Results of Criterion Referenced Prediction Measures:  Risk Categories for the Static-99R and Static-2002R Sexual Offender Risk Assessment Tools, 29 Psychological Assessment 582, 592 (2017) (new risk categories "have sufficiently improved conceptual coherence and have sufficient empirical support to replace the original categories").

Given this view of the risk category labels by the experts who develop and use them, we are not persuaded that such testimony aids the jury in determining sexual dangerousness. Cf. Simon v. Solomon, 385 Mass. 91, 105 (1982) ("expert testimony on matters within the witness's field of expertise is admissible whenever it will aid the jury in reaching a decision").  Accordingly, we conclude that the admission of qualified examiners' testimony characterizing the defendant's Static-99R score as "moderate-high" or "high" was error.

The defendant filed a pretrial motion to exclude the Static-99R risk category labels, which the judge denied.  Thus, we must determine whether the improper admission of Static-99R risk category labels was nonprejudicial, that is "whether 'the error did not influence the jury, or had but very slight effect." Commonwealth v. Christian, 430 Mass. 552, 563 (2000), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). See Commonwealth v. Grady, 474 Mass. 715, 718, 721 (2016).  We conclude that that the erroneous admission of testimony regarding the Static-99R risk category labels does not warrant reversal.

The expert testimony regarding the defendant's Static-99R risk category was appropriately limited; it was presented as only one of many factors in the SDP calculus.  For example, Rouse-Weir explained that the Static-99R is an actuarial tool

only, and that examiners have agreed to use the actuarial instrument "in a limited fashion."  Also as explained to the jury, the qualified examiners considered several "dynamic factors,"[9] which the Static-99R test does not take into account. For example, Belle and Rouse-Weir considered matters such as substance abuse history, "deviant sexual interests," "cognitive distortions," and "intimacy deficits," all of which are relevant to sexual dangerousness.  In addition, the qualified examiners included in the sexual dangerousness calculus the defendant's family history, educational and work background, incarceration records, treatment history, and release plans.  Given the limited nature of the use of the Static-99R in the qualified examiners' over-all risk assessment analysis of the defendant, we conclude that the admission of testimony regarding the risk category labels was nonprejudicial.

Recognizing that our holding as to risk category labels modifies the manner in which the Static-99R may be used in SDP proceedings, we take this opportunity to clarify that our holding is limited.  Both the Static-99R score and the corresponding percentage reflecting the risk of sexual offense in qualified examiners' testimony continue to be admissible. Our holding makes inadmissible the risk category labels only, as

---

[9] Dynamic risk factors are "more fluid" and can change over time.

the risk category labels, unlike the Static-99R score and the corresponding percentage reflecting the risk of sexual reoffense, provide little aid to the jury in rendering its decision.

Conclusion.  Under G. L. c. 123A, an ASPD diagnosis is adequate to satisfy the definitional requirements of an SDP where the Commonwealth also proves that, as a result of the ASPD, the individual is likely to engage in sexual offenses if not confined, and in this case there was no error requiring reversal.  Therefore, we affirm the judgment and order for the defendant's civil commitment as an SDP.

So ordered.