Hanlon, J.
George Souza filed a petition in Superior Court seeking release from his civil confinement as a “sexually dangerous person” (SDP). See G. L. c. 123A, § 9. At trial, the jury was unable to reach a verdict, and thereafter, the trial judge allowed Souza’s motion for a directed verdict. The Commonwealth appeals, arguing there was sufficient evidence to permit a retrial. We agree and reverse.
Background. We recite the evidence heard by the jury in the light most favorable to the Commonwealth. Commonwealth v. Cowen, 452 Mass. 757, 763 (2008). Souza has a significant adult criminal record, extending over a period from 1963 until his last *163 conviction in 2000.[1] In 1971, he pleaded guilty in New York to “rape in the second degree” for having “engaged in sexual intercourse with ... [a] female less than . . . fourteen years of age.”[2] Souza has maintained that the victim was working as a “prostitute” at the time, that she looked eighteen to him, and that she agreed to engage in sex with him. Nevertheless, in one interview, he also stated, “[A] little girl came... it was my fault... this little child... I should never [have] went with this child.” When asked how old the girl had been, he said, “I have no idea ... I don’t even want to guess.” He was then twenty-seven years old. On another occasion, in 2011, Souza asserted that the police entered the room where he was with the victim “before any sexual activity took place.” More recently, in a group therapy session in 2012, Souza, discussing the New York offense, told the group that he had “engagfed] in sexual intercourse with a 15-year-old prostitute . . . [and] that she did not look 15 because they make them bigger in New York.”
Souza’s conviction in 2000 of indecent assault and battery on a child under the age of fourteen arises out of an incident in 1990 *164 with a nine year old boy in Fall River. After he was arrested, Souza defaulted and left the State. Arrested on another charge in New York, Souza was returned to Massachusetts and pleaded guilty in 2000. The Commonwealth alleged that Souza had offered the victim a ride on a motorcycle, and then accosted him, pulling down his pants and the victim’s pants and then putting his penis in the victim’s mouth and ejaculating. Souza told the victim not to tell his mother or he would “hurt him bad.” At the plea hearing, Souza admitted only to rubbing the victim’s penis and thereafter denied any involvement in the incident, accusing the victim’s mother of fabricating the story and his lawyer of forcing him to plead guilty.
For that incident, Souza received a sentence of three years to three years and one day. Before his release, the Commonwealth filed a petition alleging that Souza was sexually dangerous under the provisions of G. L. c. 123A, §§ 1, 12-16. After a jury-waived trial, the judge found Souza to be an SDP and committed him to the Massachusetts Treatment Center (treatment center) for an indefinite term. See G. L. c. 123A, § 14. Souza appealed, challenging both the sufficiency of the evidence that he was an SDP and the use of statements he made to the Commonwealth’s expert. This court affirmed in a memorandum and order pursuant to our rule 1:28. See Commonwealth v. Souza, 70 Mass. App. Ct. 1105 (2007).
Souza’s record while incarcerated reveals a number of incidents. He was the victim of an assault by other inmates at least once. In addition, he was disciplined for some relatively minor infractions, along with physical altercations on a number of occasions. At the treatment center, he received twenty-three “Observation of Behavior Reports” (OBRs) during the decade he was confined there. Those records included some substantiated incidents of violence: in 2004, Souza got into a physical altercation with his roommate, and in February of 2012, he spat at and pushed another resident and then banged his own head on a cell door to make it look as though a guard had attacked him.
It is undisputed that Souza did not complete sex offender treatment while he was at the treatment center. In fact, although he had begun the initial phase of treatment during his incarceration for the incident with the nine year old boy, Souza did not enroll in any treatment during his first six years at the treatment center. Despite his regular attendance in treatment classes thereafter, Souza made only limited progress. At the time of trial, when Souza was sixty-nine, he remained in the early stages of the *165 treatment programs offered to him.[3]
In March of 2012, a divided community access board (CAB) concluded, in a four-to-one vote, that Souza no longer met the criteria of an SDP. The two qualified examiners (QEs) who examined him also were divided on the question.
The Commonwealth’s case at trial. At trial, the Commonwealth relied primarily on the testimony of two experts.[4] Frederick W. Kelso, Ph.D., one of the QEs, testified that Souza suffered from “pedophilia” and “antisocial personality disorder” (APD), as those terms are defined in the American Psychiatric Association’s Diagnostic and Statistical Manual of Mental Disorders (rev. 4th ed. 2000) (DSM-IV). Kelso opined that those mental conditions interfered with Souza’s ability to control his sexual urges, and that he was likely to reoffend if not confined. He identified Souza’s “risk factors” as having committed a prior sex offense, including a sex offense against a stranger; sex offenses against children not related to him; and a sex offense against a male. Kelso also noted Souza’s “past experience of deviant sexual preferences, and his failure to complete sex offender treatment at the Treatment Center.” At the time of the Fall River incident, Souza was “then forty-six years old, and the victim of the sex offense was a boy who was then nine years and one month old.”
Niklos Tomich, Psy.D., chair of CAB, filed a minority report from the CAB, concluding that Souza was still sexually dangerous. He essentially agreed with Kelso. Tomich described Souza as an “outlier. . . . [I]t means somebody who differentiates from the norm.”[5] According to Tomich, Souza “essentially showed an enduring and rather chronic course of antisocial behavior. That *166 has been unremitting. He has shown very little remorse. He essentially continues to obfuscate responsibility for the crimes for which he was convicted, especially the sex offenses, which is what [Tomich was] mostly concerned about.”
Significantly, Tomich also opined that Souza “meets the criteria for pedophilia.”[6] He pointed out that “both his victims were children [and that]... [w]hat stood out... for those offenses was the fact that they occurred over a very long period of time. And, in addition, he has both a male victim and a female victim. So, this tends to increase his victim pool.” In addition, Tomich found significant the fact that the girl victim was a stranger, thus increasing the pool of potential victims, and that, when Souza committed the offense against the boy victim, he knew about the possible repercussions in the criminal justice system, having previously served a four-year sentence in New York.
Tomich contrasted those “static factors,” factors that do not change over time, with “what are called dynamic factors or factors that . . . may change over time, that may get stronger or weaker, depending on the situation [Souza’s] in.” In this case, those factors also supported Tomich’s conclusion that Souza was an SDP, particularly his “unwillingness to abide by the mores and folkways and rules of society. He just doesn’t want to do that and he hasn’t.” Tomich also considered Souza’s unwillingness to take responsibility for either offense.
Tomich did consider protective factors, including Souza’s age of sixty-nine, an age at which sex offenders often are considered less dangerous. Tomich noted that Souza’s second sex offense took place when he was forty-six and that his last criminal arrest took place when he was fifty-five; in addition, Souza’s behavior in the treatment center included offenses that could have been charged as criminal had he not been held. Finally, while Souza was engaged in treatment, he was only at a preliminary stage of that treatment, a level that Tomich found “inadequate.” In support, he pointed to a treatment note from a group therapy session *167 less than two months before the trial. In that group, Souza had given three different accounts of the New York offense and the surrounding circumstances within the time of one session. Tomich stated that he wasn’t suggesting that Souza was lying. Instead, he stressed that Souza “is disordered and requires treatment----[A] function of his disorder is that he distorts his history and distorts events in the record. That complicates and confounds treatment.”
Souza’s case. Souza countered with testimony from four experts: Michael G. Henry, Psy.D. (the other QE), Michael J. Murphy, Ed.D. (the CAB member who authored the CAB majority report), and two privately-retained psychologists. Focusing especially on Souza’s advanced age, the PPG results, and the limited evidence that he suffered from any sexual compulsions at the time of trial, those experts opined that Souza was not currently sexually dangerous and did not present a likelihood of reoffending.
The directed verdict. Souza moved for a directed verdict after the Commonwealth rested its case and again at the end of the trial. The judge reserved ruling on the motion and sent the case to the jury.[7] The jury reported that they had reached “an impass[e],” and they “remained] deadlocked” even after receiving a Tuey-Rodriquez charge.[8] See Commonwealth v. Rodriquez, 364 Mass. 87, 101-102 (1973). The judge discharged them and allowed both sides to submit briefing on Souza’s motion for a directed verdict. In a memorandum of decision issued on April 11, 2013, the judge allowed Souza’s motion. Judgment entered, and this appeal ensued.[9]
In her memorandum of decision, the judge ruled that “[a] prop *168 erly instructed rational juror could not find that the Commonwealth had proved beyond a reasonable doubt that petitioner suffers from Pedophilia as defined in the DSMIV.” In a footnote, she stated, “All of the experts, including Dr. Kelso, testified that the criteria for Pedophilia in the DSM-IV include ‘over a period at least 6 months, recurrent, intense, sexually arousing fantasies, sexual urges or behaviors involving sexual activity with a prepubescent child or children (generally 13 years of age or younger).’ ” While the judge acknowledged that the nine year old male victim in the 1990 incident clearly was prepubescent, she found the evidence insufficient to support a conclusion that the thirteen year old female victim in the 1971 incident was prepubescent. In so doing, the judge relied on the testimony of a defense expert, saying that “[t]he Tanner scale, which is used by pediatricians to stage physical sexual development of children, places a 13 year old at 85-90% post-pubescent.” From this, the judge concluded that it was “very unlikely” that the thirteen year old was prepubescent and therefore the conclusion of both Commonwealth experts, based as it was on “an insufficient evidentiary foundation,” was not sufficient to meet the Commonwealth’s burden of proof.
While the judge acknowledged that the “evidence was sufficient to support a finding beyond a reasonable doubt that petitioner today suffers from an Antisocial Personality Disorder,” in her view, that diagnosis alone was not sufficient because, as she said (rightly), “to establish sexual dangerousness, the Commonwealth must prove beyond a reasonable doubt that the mental condition causes serious difficulty in controlling sexual impulses today” She concluded:
“[T]he petitioner is 69 years old today. His most recent sexual offense or sexual misconduct of any kind was in 1990. He was a fugitive for eight years and has been incarcerated since 1999. There is no evidence of any sexual interest in children or sexual acting out of any kind during the years petitioner lived in the community on bail and as a fugitive (1991-1999) or during the thirteen years since his incarceration on the 1990 offense and subsequent civil commitment (1999 to the present).”
*169 Given the fact that the “only evidence of sexual interest in children on the part of petitioner are the crimes committed in . . . 1971 and 1990,” the judge dismissed as inappropriate considerations of Souza’s failure to engage in treatment, score on the “Static 99,” and “antisocial tendencies.”
Discussion. Sufficiency. The issue is “whether, after viewing the evidence (and all permissible inferences) in the light most favorable to the Commonwealth, any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of sexual dangerousness as defined by G. L. c. 123A, § 1.” Commonwealth v. Blake, 454 Mass. 267, 271 (2009) (Ireland, J., concurring), quoting from Commonwealth v. Boyer, 61 Mass. App. Ct. 582, 589 (2004). Applying that standard, we are satisfied that the Commonwealth’s evidence here was sufficient to reach the jury.
As relevant to this case, a “ ‘[sjexually dangerous person’ [is] any person who has been .. . (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires.” G. L. c. 123A, § 1, as appearing in St. 1999, c. 74, § 6. As the Commonwealth argues, the first two elements of the statute are not at issue.
In support of the third element, the Commonwealth offered two expert witnesses, each of whom testified that, in his opinion, Souza was an SDP. There was no challenge to the expertise of either witness, and the testimony itself was admitted without objection. Each of the Commonwealth expert witnesses testified that Souza suffered from antisocial personality disorder and pedophilia. “[Ejither diagnosis is adequate to satisfy the definitional requirements of a sexually dangerous person in G. L. c. 123A, § 1.” Commonwealth v. Reese, 438 Mass. 519, 526 n.9 (2003). Kelso testified that, in his opinion, Souza’s behavior in committing the two separate sexual offenses was repetitive and compulsive,[10] and “at the present time, Mr. Souza is not adequately able to control his sexual impulses and would not be able to ad *170 equately control his sexual impulses if he were to now be released from the Treatment Center.” Tomich also testified that Souza’s offenses were repetitive and compulsive and that he was unable to “effectively intervene in or control his sexual impulses.” Each expert opined that, “if released, Mr. Souza would be likely to re-offend sexually if not confined to a secure facility.”
The judge’s conclusion to the contrary rests significantly upon her acceptance of the defense witness’s testimony about the “Tanner scale[’s]” definition of prepubescence and the consequences of that definition for the DSM-IV’s definition of pedophilia. That was an issue of credibility that should have been left to the jury. “The matter of how much weight is to be given a witness, particularly an expert witness, is a matter for the trier of fact.... See Hill, petitioner, 422 Mass. 147, 156 (1996). This is particularly true of experts in the medical field, who regularly are permitted to testify on the basis of examination of records and other materials with respect to an issue in dispute.” Commonwealth v. Cowen, 452 Mass, at 762.
As the courts have noted repeatedly, “the sexually dangerous persons statute makes no reference to [the DSM-IV], nor does it set forth any requirement that the statutory definition of mental abnormality be limited to the abnormalities outlined in the DSM-IV. Cf. Doe, Sex Offender Registry Bd. No. 1211 v. Sex Offender Registry Bd., 447 Mass. 750, 765 n.13 (2006) (‘[p]edophilia is a psychiatric disorder, not a legal classification’).” Commonwealth v Starkus, 69 Mass. App. Ct. 326, 336 (2007). See Commonwealth v. Husband, 82 Mass. App. Ct. 1, 5 (2012) (“[T]he legal definition of personality disorder applicable to SDP proceedings is not required to match the clinical definition of personality disorder found in the [DSM-IV]. . . . The technical distinctions among various clinical diagnoses are immaterial so long as the Commonwealth proves beyond a reasonable doubt that the defendant suffers from a ‘personality disorder which makes [him] likely to engage in sexual offenses if not confined to a secure facility.’ G. L. c. 123A, § 1”).
Equally important, the DSM-IV definition of pedophilia on its face describes prepubescent as “generally age 13 or younger.” Commonwealth v. Starkus, supra at 336. It is only the gloss added *171 by the defense expert’s definition of prepubescence that permitted the judge to opine that it was “very unlikely” that this thirteen year old female victim was “prepubescent” in 1971, despite Souza’s description of her (at least once) as having been a “little child” when he raped her. In fact, regardless of the precise state of the child’s anatomical development, this victim was far below the age of consent, and Souza’s actions with her, at age twenty-seven, reasonably could be seen by a factfinder as manifesting a form of “mental abnormality” within the meaning of the statute.
Nor can the petitioner’s age or the length of time since his last conviction for a sex offense be considered dispositive here. Each of the Commonwealth’s experts considered those factors as protective and reasonably concluded that, considering all the factors, they did not change the assessment. For example, Kelso relied in part on the so-called “Static 99R” model, a predictive tool that takes into account a subject’s age. Applying that model to the particulars of Souza’s offenses and history, Kelso scored him as a five or a six, the latter score falling into the range of what is considered a high risk of reoffending.[11] Thus, the jury had before it empirically-based evidence that Souza presented a high risk to reoffend notwithstanding his age.
The law is clear that the lapse of time, by itself, is not dis-positive, particularly when the petitioner has been held for a significant period of time in a secure environment with no opportunity to interact with young children. See Commonwealth v. Blanchette, 54 Mass. App. Ct. 165, 178 (2002) (“[T]he judge appears to have reduced the grounds for the expert’s opinion only to [the petitioner’s] prior sex crimes, ignoring in the process other factors which he considered when forming his opinion, such as [the petitioner’s] personal history and [his] decision, while incarcerated, to decline sexual offender treatment. As to the latter, the *172 Supreme Judicial Court cogently observed in . . . Hill, ¡petitioner,] 422 Mass. . . . [at] 157, . . . that ‘[ejxamples of recent conduct showing sexual dangerousness may often be lacking where the individual’s dangerous disposition is of a sort that there will be no occasion for that disposition to manifest itself in a secure environment. And it cannot be the case that an individual’s refusal to submit to examination or to participate in treatment, in which his current dispositions might manifest themselves, will more or less automatically guarantee himself a favorable determination’ ”).
The court’s language in Commonwealth v. Reese, 438 Mass, at 526, is instructive here. “It is ... apparent from the record that the ruling is an expression of the judge’s personal conclusion regarding the experts’] credibility, based on [her] own opinion of the proper application of the DSM-IV, and the significance of the differences between [the experts’] testimony and the DSM-IV text. This was error. The testimony of the expert[s] is not ‘so incredible, insubstantial, or otherwise of such a quality that no reasonable person could rely on it.’ Commonwealth v. Blanchette, supra at 175.”
Jury instructions. The Commonwealth also argues that the judge erred in instructing the jury with regard to the extent it was to rely on the testimony of Kelso (who testified as a QE), as opposed to the testimony of Tomich (who did not). Specifically, based on her reading of Johnstone, petitioner, 453 Mass. 544, 553 (2009), the judge instructed the jury that:
“You heard of testimony from Dr. Tomich, a representative of the community access board. The law permits a representative of the community access board to testify in all proceedings like this one, and you may certainly rely upon the testimony of Dr. Tomich. However, you cannot find that the petitioner, Mr. Souza, is sexually dangerous based solely on the testimony of Dr. Tomich. In order for you to find that Mr. Souza is today a sexually dangerous person, you must find support for that determination in the opinion that [sic] Dr. Kelso, who testified as a qualified examiner.”
Because the propriety of this instruction is likely to arise again in a retrial, we address it now.
*173 We agree with the Commonwealth that such an instruction is not compelled by Johnstone, and that it is otherwise inadvisable. Johnstone held only that the Commonwealth cannot continue to pursue SDP confinement of someone unless at least one of the two assigned QEs concludes that the person is an SDP. Id. at 553. That precondition was satisfied here. As the judge herself recognized, in determining whether someone is an SDP, jurors are not precluded from relying on evidence from non-QE sources. The judge’s efforts to acknowledge this to the jury, while still trying to create a special evidentiary role for the QE, led to an instruction that was confusing at best and not a fair statement of the law. Where, as here, the gatekeeping role served by QEs has been satisfied, and the Commonwealth offers additional expert testimony, a trial judge should refrain from suggesting the relative weight the jury can or should assign to the various Commonwealth experts.[12]
Conclusion. We vacate the judgment and remand this matter to the Superior Court for further proceedings consistent with this opinion.

So ordered.

There was evidence that Souza first came to the attention of the police when he was eleven years old. At the trial, his record showed Massachusetts convictions of indecent assault and battery on a child under fourteen, robbery, larceny from the person, breaking and entering with intent to commit a felony, and larceny from a building. There were convictions in New York of criminal possession of a forged instrument, endangering the welfare of a child, and rape in the second degree. The “counterfeiting and the endangering of a child’s welfare . . . chargefs] [were apparently] a result of having three young adolescent boys essentially run the counterfeit money into various establishments and get change for objects that Mr. Souza then kept or split with the boys.”
The record also indicates that Souza has “committed crimes in a number of [other] states including . . . Rhode Island, Oklahoma, Nevada, and California.”

The same indictment also charged Souza with, on or about May 25, 1971, until on or about June 7, 1971, two counts of “promoting prostitution in the first degree” by “knowingly advancing] and profiting] from prostitution of a person less than sixteen years old, to wit, [a victim], aged thirteen.” A third count charged Souza with “promoting prostitution in the second degree,” committed as follows: “[s]aid defendant . . . advanced and profited from prostitution by managing, supervising, controlling and owning, a house of prostitution and a prostitution business and enterprise involving prostitution activity by two prostitutes.” Those charges apparently were dropped, and because the names of the victim or victims were redacted from the copy of the indictment introduced at trial, it is not completely clear whether the victim of the rape charge was also the subject of the prostitution charges. However, in a 2003 evaluation by John Daignault, Psy.D., Souza stated that, after he paid the victim in the 1971 rape case, the victim “asked to stay with him and he let her, and he ended up getting arrested several days later because he was letting her ‘trick’ out of his house and the police investigated.”

In 2012, the treatment center subjected Souza to a “penile plethysmograph” (PPG) test designed to measure the extent to which he was aroused by various appropriate and inappropriate stimuli. According to the test evaluator, Souza did not demonstrate any significant arousal to any stimuli, and based on those results, behavioral conditioning was not recommended at that time.

Two other Commonwealth witnesses testified briefly. The deputy superintendent of classification and treatment at the treatment center testified that Souza exercised regularly, running laps in the exercise yard, and that Souza has spoken to him about how important it is for him to stay in good physical shape. The assistant treatment coordinator at the treatment center testified that Souza had been suspended from participation in group therapy for a “physical altercation that took place” between Souza and another resident and that there had been unexcused absences from the group as well.

Tomich explained that Souza “has two convictions of sexual offenses, but he also has a very long criminal history that includes seventeen additional convictions . . . including other types of offenses. . . . Subsequent to his most recent *166 period of incarceration and then civil commitment, he also has approximately twenty-five disciplinary reports, some of them of a violent nature.”

In her memorandum of decision, the judge stated that, while Tomich found that Souza exhibited signs of pedophilia, “he did not diagnose Mr. Souza with” that disorder. Although the import of the distinction the judge drew is not entirely clear, Tomich made it plain that he did in fact diagnose Sousa with pedophilia. In response to the prosecutor’s question, “Did you diagnose Mr. Souza with anything else?” Tomich replied, “Yes.” To the question, “And what was that?” Tomich replied, “He also meets the criteria for pedophilia.”

The case had been tried earlier to a different jury, but a mistrial was declared after Souza became ill.

In a jury trial held on a G. L. c. 123A, § 9, release petition, the jury may act through a five-sixths majority, as is generally true in civil cases. Sheridan, petitioner, 422 Mass. 776, 780-781 (1996). See generally G. L. c. 234, § 34A.

Judgment entered in Souza’s favor on April 17, 2013, but the judge temporarily stayed Souza’s release to allow the Commonwealth time to determine whether to appeal. The Commonwealth filed its notice of appeal on April 29, 2013. It then requested that Souza’s release further be stayed, and Souza cross-moved, requesting that he be released pending appeal subject to various specified conditions, including global positioning system (GPS) monitoring. The trial judge allowed Souza’s motion, and a single justice of this court denied the Commonwealth’s motion for a stay pending appeal. The Commonwealth then pursued a stay through filing a petition pursuant to G. L. c. 211, § 3. A single justice of the Supreme Judicial Court denied that petition on June 26, 2013. Souza eventually was released pursuant to an amended “order of dis *168 charge” entered on June 28, 2013, that included GPS monitoring and nine other conditions. He has completed all of his sentences and has no probation or parole conditions remaining on any underlying offense.

Dr. Kelso noted that, notwithstanding the fact that Souza was put on notice by the State of New York in 1971 that his behavior in committing the sexual offense against the young girl was “inappropriate and criminal and that engaging *170 in that kind of conduct would result in a serious negative consequence, incarceration,” Souza went on to commit a second sexual offense in Massachusetts, which “speaks to the sense that he’s compelled to engage in the behavior even after he experiences a negative consequence.”

In Kelso’s testimony and his report, he referred to “Static-99.” Asked by the prosecutor to explain what that was, Kelso responded that it was “a very widely used sex offender risk assessment instrument.” A different version, “the Static-99R[,] adjusts the age item so that if you’re an older sex offender, your advanced age is taken into account in terms of your total score.” Kelso testified that Souza’s score was slightly lower on the Static-99R than on the Static-99, but that he remained a high risk to offend, even with the lower score. Specifically, Kelso testified that “while [he thought Souza’s] current age [was] one factor that merits consideration in the risk assessment, [he didn’t] think it so overwhelm[ed] his status on the other risk factors as to be the only risk factor worthy of consideration.” In particular, Kelso noted that Souza was forty-six when he committed the 1990 sex offense with the boy victim.

The Commonwealth also seeks review of Souza’s release on conditions pending appeal. However, it did not file a notice of appeal regarding any of the orders that allowed his release pending appeal and, therefore, cannot seek review of such orders now. As Souza points out, the propriety of his release pending appeal is also now moot.