NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-1194                                        Appeals Court

COMMONWEALTH  vs.  ROBERT KENNETH SPRING, JR.

No. 17-P-1194.

Norfolk.     June 1, 2018. - October 24, 2018.

Present:  Milkey, Sullivan, & McDonough, JJ.

Sex Offender.  Practice, Civil, Sex offender, Instructions to
     jury, Assistance of counsel, New trial, Directed verdict.
     Constitutional Law, Assistance of counsel.

     Petition for civil commitment filed in the Superior Court
Department on January 9, 2015.

     The case was tried before Raymond J. Brassard, J., and a
motion for a new trial, filed on October 13, 2016, was heard by
William F. Sullivan, J.

     David B. Hirsch for the defendant.
     Tracey A. Cusick, Assistant District Attorney, for the
Commonwealth.

     SULLIVAN, J.  Following a jury trial, the defendant, Robert

Kenneth Spring, Jr., was found to be a sexually dangerous person

(SDP).  See G. L. c. 123A, §§ 12, 14.  The evidence at trial

established that he had a history of both contact and noncontact

sex offenses, and the jury were asked to determine whether the defendant would commit either kind of sex offense in the future. This case calls upon us to address, in the context of a motion for new trial claiming ineffective assistance of counsel, what instruction the jury should have been given regarding whether the defendant was likely to reoffend in such a way as to render him a sexually dangerous person.

To be found a sexually dangerous person, a finder of fact must determine beyond a reasonable doubt that a defendant suffers from a mental abnormality that renders him "a menace to the health and safety of other persons."  G. L. c. 123A, § 1.[1] In Commonwealth v. Suave, 460 Mass. 582, 588 (2011), the Supreme Judicial Court held, in a case involving solely noncontact sex offenses against adult victims, that a defendant can be found to be a menace, and therefore a sexually dangerous person, only where the Commonwealth has shown (among other things) that "the defendant's predicted sexual offenses will instill in his

---

[1] "In order to find the defendant is a 'sexually dangerous person,' the Commonwealth must prove three things:  (1) the defendant has been convicted of a '[s]exual offense' . . . ; (2) he suffers from a '[m]ental abnormality' or '[p]ersonality disorder' . . . ; and (3) as a result of such mental abnormality or personality disorder, the defendant is 'likely to engage in sexual offenses if not confined to a secure facility.'" Commonwealth v. Suave, 460 Mass. 582, 584 n.3 (2011), quoting G. L. c. 123A, § 1 (definition of "[s]exually dangerous person").

victims a reasonable apprehension of being subjected to a contact sex crime."

Some two and one-half years later, in a pair of cases issued the same day, the court again considered the Suave test. Commonwealth v. Fay, 467 Mass. 574, cert. denied, 135 S. Ct. 150 (2014), involved noncontact sex offenses against children. Fay affirmed a determination in a jury-waived trial that the defendant, who had engaged in noncontact sex offenses that included luring and approaching behavior towards children, was an SDP, as his behavior could place children in reasonable fear of a contact offense in the future.

In Commonwealth v. Walker, 467 Mass. 1017 (2014), a jury-waived case tried before Suave, involving a history of both contact and noncontact sex offenses, the Supreme Judicial Court considered the judge's finding that the defendant was likely to commit noncontact sex offenses. The Supreme Judicial Court vacated the judgment, holding that "[i]f the only basis for the judge's conclusion that the defendant is a 'menace' were the likelihood that the defendant would commit noncontact offenses, without the further finding that these offenses would be likely to instill in his victims a reasonable apprehension of being subjected to a contact sex crime, the defendant could not be found sexually dangerous." Id. at 1018. Because the judge's findings regarding the commission of future contact sex offenses

were also unclear, the matter was remanded for further findings as to the likelihood the defendant would engage in contact or noncontact sex offenses in the future, and, if the latter only, whether the Suave test was satisfied.  Id.[2]

Today's case, tried over a year after the decisions in Fay and Walker issued, presents a similar legal question in the context of a jury trial.  Here, the defendant had committed multiple contact offenses against children between 1980 and 1993, resulting in two convictions, for which he received a suspended sentence and a period of probation.  In the twenty-two years preceding the SDP trial he did not commit any other contact sex offenses, but he acquired and viewed child pornography that contained graphic images of contact sex offenses involving young children.  In 2014, the defendant pleaded guilty to one count of possession of child pornography and was sentenced to two and one-half years in the house of correction, with one year to serve.

---

[2] A third case, Commonwealth v. Almeida, 467 Mass. 1015 (2014), also issued the same day as Walker and Fay.  The jury-waived SDP trial in Almeida was held before Suave issued and, like Suave, involved a history of noncontact sex offenses against adult victims.  The trial judge's determination in Almeida that the defendant was an SDP was vacated, and the case was remanded for further findings consistent with the requirements of Suave.

The 2014 conviction led to this SDP proceeding.  However, there was no evidence at the SDP trial that the defendant created, shared, or distributed child pornography, lured or approached children using child pornography, or showed child pornography to any child (or any other person) in such a way as to instill a reasonable fear of a contact sex offense.  The jury asked three very specific questions, one during the questioning of an expert witness, and two during deliberations, concerning whether viewing child pornography rendered the defendant a sexually dangerous person.  Despite these questions, counsel did not request, and the jury were not given, an instruction that if they found the defendant likely to engage solely in the noncontact offense of viewing child pornography, they could not find him to be an SDP unless they also found that the noncontact offense "will instill in his victims a reasonable apprehension of being subjected to a contact sex crime."  Suave, 460 Mass. at 588 (hereinafter Suave/Fay/Walker instruction).

On motion for new trial, the defendant argued that his counsel was ineffective for failing to request such an instruction, and that he was prejudiced as a result.  On this record, and consistent with the case law, see Kansas v. Hendricks, 521 U.S. 346, 357-358 (1997); Walker, 467 Mass. at 1017-1018, we agree.  The instructions permitted the jury to conclude that the defendant was an SDP based on a finding that

he was likely to reoffend by possessing child pornography, without more. The instruction given permitted the jury to find the defendant a sexually dangerous person under circumstances that do not meet the statutory definition of an SDP, as interpreted by the Supreme Judicial Court.

Background. 1. Contact offenses. The defendant's history of contact offenses, both charged and uncharged, was undisputed. The defendant committed his first sex offense in 1980 when he was seventeen; he performed oral sex on a young boy and touched a young girl in the vaginal area over her clothes. He was later charged with touching a fifteen year old girl by putting his hands down her pants. In 1981, when the defendant was eighteen, he sexually abused two young boys, ages nine and eleven, while babysitting for them.[3]

In 1993, the defendant turned himself in and pleaded guilty to two counts of indecent assault and battery on Lara[4] and another girl, both under the age of fourteen. See G. L. c. 265,

---

[3] On multiple occasions, the defendant masturbated the boys. He also watched the younger boy urinate between his five year old sister's legs. He claimed that the boys were "girl-crazy," "always aroused," and that some of the offenses occurred while they were "exploring each other's bodies." He justified his behavior by explaining that "things were different back then."

[4] A pseudonym.

§ 13B.[5]  The defendant admitted touching Lara over a two-year

period while she was between the ages of eight and ten.[6,7]  As a

result of these convictions, he was sentenced to two and one-

half years in the house of correction, suspended until October,

1996, with probationary conditions.

2.  Child pornography.  In 1993, while on probation and

attending court-ordered group therapy stemming from his indecent

assault and battery convictions, the defendant learned (from

members of his therapy group) how to get child pornography.  He

continued to collect child pornography containing graphic images

of contact offenses against young children until his arrest in

March, 2012, for possession of child pornography.  See G. L.

---

[5] The defendant had spent significant sums of money on Lara
and her brother to procure the brother's silence.

[6] He fondled Lara's breast and vagina over her clothes as
she slept.  The defendant masturbated while touching her.  He
justified his conduct by stating that he "never fucked [Lara] as
her father did."  The defendant referred to Lara as his girl
friend and stated that "[she] would call him at work, [and] they
would fool around and wrestle."  He claimed that he was in love
with her and viewed himself as being in a relationship with her,
even though she was a child.  On one occasion, the defendant
indecently assaulted Lara's friend, also a young girl, by
touching her vagina over her bathing suit.

[7] Also in 1993 the defendant engaged in inappropriate
behavior with two eleven year old girls.  He grabbed them and
kissed them and described one as having a "spongy ass."  After
being confronted by the mother of one of the girls, the
defendant stated that he was glad the girl was moving away
because he was concerned that "something might . . . happen[]"
because he had "a crush" on both of the young girls.

c. 272, § 29C.[8]  The defendant told a therapist that he

"realize[d] that he has a sexual interest in children," and used

child pornography as "self-therapy," and to prevent himself from

committing additional sex offenses against children.

A forensic examiner identified 4,800 images of child

pornography seized from the defendant.  The examiner also

testified that someone accessed child pornography from the

defendant's computer in the days immediately leading up to his

arrest.[9]

c.  New contact with Lara.  Before his 2012 arrest, the

defendant renewed contact with Lara, by this time an adult.

According to the defendant, they became engaged in 2013.

Although the defendant stated that he is in love with Lara, he

---

[8] The images seized from the defendant included prepubescent
children fully displaying their genitals, oral sex with
children, oral sex with adult men and women, and penetrative
acts with adult males and females.  Some images showed adult men
vaginally or anally penetrating young girls; others showed men
anally penetrating young boys.  One image was an adult male with
an erect penis standing over an infant in a crib.  Another image
showed a girl bound with rope, with her legs spread open on a
bed.  Most of the children were between six and twelve years
old; some images were of four and five year old children.  Eight
hundred and seventeen images were of victims later identified by
the National Center for Missing and Exploited Children.

[9] Bookmarks on the defendant's desktop computer included
"Lesbian Lolita stories about the homoerotic experiences of
little girls" and "Child sex stories of child erotica, little
girls nude."  The desktop computer had been used for Google
searches that included "girls photos teen," "teen girls photos,"
and "pre-teen girls photos."

also stated that he has not had contact with her since his incarceration and would not have contact with her if he is released.[10]

4. Expert testimony. At trial, the defense proceeded on a theory that because of the defendant's age (fifty-two at the time of trial) and the extended period of time he had been living in the community without committing a contact sex offense, he was not sexually dangerous and was not likely to commit any sex offense -- contact or noncontact -- if released. The Commonwealth argued that the defendant had a long history of contact and noncontact offenses and that he was likely to commit a sex offense of one kind or another if released. The expert testimony tracked these theories.

The Commonwealth's and defendant's experts all opined that the defendant had pedophilic disorder. In rendering their opinions, the Commonwealth's experts, Dr. Katrin Rouse-Weir, who served as a qualified examiner in the case, and Dr. Gregg Belle, did not distinguish between contact and noncontact offenses in assessing the likelihood that the defendant would reoffend.

---

[10] The defendant had limited or no sexual contact with Lara, who, he claimed, had extorted $7,000 from him to obtain her agreement not to report that he had kissed her. After he was incarcerated, a "significant portion of [the defendant's] home was burned down," apparently accidentally, "while [Lara] was residing at the house."

They did not offer any opinion whether the defendant, if he committed only noncontact offenses in the future, would put another in reasonable fear of a contact offense. Dr. Rouse-Weir opined that the defendant's mental abnormality "predisposes him to the commission of criminal sexual acts, the possession and use of child pornography." She also found significant the fact that the defendant "has committed a number of contact sex offenses involving children[,]" and stated, "[I]n my opinion . . . he meets the criteria for menace in the statute." She concluded that "[the defendant is] at risk of reoffending with a sexual offense, contact or noncontact offense." Similarly, Dr. Belle testified that there was a "relative certainty" that the defendant was likely to commit a sexual offense, but stated categorically, "I'm not making a distinction of it's contact or noncontact. It's likely to commit a sexual offense."[11]

This testimony was the result of the Commonwealth's considered trial strategy. On the morning of the fourth day of trial, shortly before the Commonwealth concluded its case, the

---

[11] The Commonwealth's experts also testified that the defendant had a pedophilic disorder, and that despite his age, fifty-two, he had scored a "5" on the Static-99R test, which equates to a "moderate-high" risk of reoffending. Dr. Belle believed that the defendant's score underestimated his risk to reoffend and that his limited treatment during his current incarceration was insufficient to prevent him from committing another sex offense.

prosecutor moved to redact a statement from the report of the defendant's expert, Dr. Joseph Plaud, that distinguished between contact and noncontact offenses.  Citing Commonwealth v. Almeida, 467 Mass. 1015 (2014), the prosecutor argued that the requirement that the Commonwealth prove that predicted noncontact sex offenses place a future victim in reasonable apprehension of a contact sex offense applied only where the defendant had a history of noncontact sex offenses alone.  The defendant did not object, and the trial proceeded on this basis.

The defense experts, Dr. Plaud, Dr. Leonard Bard, and Dr. Angela Johnson, who served as a qualified examiner, parted company with the Commonwealth's experts on the issue of likelihood of reoffense.  All three experts characterized the defendant's probationary terms of GPS monitoring, no access to computers or Internet, and sex offender treatment as significant protective factors that would prevent him from reoffending. They opined that the decline in recidivism after age fifty, coupled with the probationary conditions, meant that the defendant was not sexually dangerous.

In particular, Dr. Plaud testified that an offender who had transitioned to noncontact-based offenses was unlikely to return to committing contact offenses, stating, "Certainly I do not believe he would be likely to reoffend with a contact based offense and look again at his own behavior over a significant

period of time.  The question more is, is he likely to engage in non-contact based offending."  Dr. Plaud then concluded, however, that the defendant was unlikely to reoffend in any way because he had demonstrated in the past that he was able to control his impulses once he had received consequences for his behavior.

At the conclusion of Dr. Plaud's testimony, the jurors asked the judge to ask the following question, "[I]s watching or having child porn considered sexually dangerous?"[12]  The judge did not ask Dr. Plaud the question as the jury phrased it, because the Commonwealth objected to any question that distinguished between contact and noncontact offenses.[13]  Later that day, the jury asked the judge to pose multiple questions concerning the number of logins to the defendant's computer containing images of child pornography, and whether the forensic examiner could tell how recently and frequently the defendant had viewed child pornography.

---

[12] At the conclusion of each witness's testimony, the judge permitted the jury to write down questions for him to ask the witness.

[13] The prosecutor objected to any question that differentiated between contact and noncontact offenses.  The judge asked Dr. Plaud, on behalf of the jury, "What dangers, if any are posed by a person having or watching child pornography?" Dr. Plaud answered that child pornography harms and exploits children, and that children are revictimized when it is distributed.

5.  Jury instructions.  The judge instructed the jury in a manner consistent with the model jury instruction.  See Massachusetts Superior Court Criminal Practice Jury Instructions § 10.2 (2d ed. 2013).[14]  He stated, in part,

> "[T]he sole issue that you are called upon to decide is whether the [defendant], as of the present time, is a sexually dangerous person.  Our legislature has defined a sexually dangerous person as follows, and I quote:  'Any person who has been convicted of a sexual offense and who suffers from a mental abnormality which makes that person likely to engage in sexual offenses if not confined to a secure facility.'"

With the assent of the parties, the judge defined "sexual offense" "to include the possession of child pornography and to include indecent assault and battery on a child under 14 years of age."  The judge explained:

> "Now ladies and gentlemen, our law defines a sexual offense to include a variety of crimes, both contact crimes -- so-called -- and noncontact crimes.  For example, indecent assault and battery on a child under 14 is a sexual offense.  For example, possession of visual material depicting a child in a sexual manner is a sexual offense.
>
> "In determining whether the [defendant] is likely to commit future acts of sexual misconduct, you may consider his past sexual misconduct as a basis for projecting future conduct.  You may consider and draw inferences from these past

_____

[14] This case was tried in August, 2015.  The 2013 model jury instructions, which are still in effect, predate Fay and Walker. By the time of the trial in this case, the model instructions for SDP cases under G. L. c. 123A, §§ 9 and 12, had been updated to include a Suave instruction, but only "[i]f the petitioner has a history of committing only noncontact sexual offenses not involving children."  Massachusetts Superior Court Criminal Practice Jury Instructions, supra at § 10.1.4(c) n.1, at 10-18; § 10.2.3(c) n.1, at 10-35.

incidents of sexual misconduct to determine whether the Commonwealth has proven that the [defendant] today suffers from the psychological forces, conditions, problems, or root causes that led him to commit those earlier acts of sexual misconduct."

The judge then defined mental abnormality to mean a "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons."  The model jury instructions did not define "menace," and based on the earlier colloquies with counsel, the judge did not define it further.

During deliberations, the jury asked the judge several questions.  In response to one question asked on the first day, after just one-half hour of deliberation, the judge provided the jurors with a copy of a select portion of G. L. c. 123A containing a list of sex offenses. The next morning, after forty minutes of deliberation, the jury asked:

"In determining if [the defendant] is sexually dangerous, are we to base our decision on . . . if [the defendant] will reoffend by either contact or noncontact offenses, such as child pornography?

. . .

"Under the law there are many types of offenses of sexual acts.  Are all these crimes listed . . . to be treated with the exact same seriousness -- , equal, or are there degrees of seriousness for each sexual offense?"

At sidebar, the judge stated, "I have already provided the jury with a list of the sexual offenses. The law does not draw any distinction among them." After conferring with counsel, the judge told the jury:

> "Briefly, you have asked me whether -- in determining whether -- if [the defendant] is a sexually dangerous person you are to base your decision on whether he would reoffend by either contact or noncontact offenses and in a similar vein asked whether all of the crimes listed, which I take to be a reference to the legal definition of sexual offenses I gave you yesterday, whether they're all to be treated with the same seriousness or whether they're all equal to one another."

The judge then reread his previous instruction regarding mental abnormality, and the likelihood of committing a sexual offense. He did not distinguish between contact and noncontact sexual offenses, saying instead, "Ladies and gentlemen, the legal definition of sexual offense, which I gave a copy of to you yesterday, enumerates . . . a list of offenses. Those offenses include both so-called contact sexual offenses and noncontact sexual offenses."

6. _Motion for new trial_. The defendant's appeal from the judgment was stayed while he filed a motion for new trial claiming (among other things) that counsel was ineffective for failing to cross-examine experts or request an instruction regarding the _Suave_/_Fay_/_Walker_ requirement that the commission of a noncontact offense place a future victim in reasonable apprehension of a contact sex offense.

Trial counsel supplied an affidavit and testified at the hearing on the motion that he had not been sufficiently aware of the Walker decision, or the impact that Suave, Fay, and Walker could have had on the trial. He testified, "There is no doubt in my mind that if I were able to go back, I would definitely request a Suave/Fay/Walker instruction; without a doubt." Trial counsel acknowledged that he was "much more aware . . . of the rulings in those three cases now than [he] was at [the time of trial]." He also stated in his affidavit that he should have corrected the Commonwealth's experts, "who testified that the [SDP] statute did not differentiate between contact and non-contact offenses." Trial counsel did not articulate a strategic or tactical reason for the omission, and testified that if he had it to do over again he would have requested a Suave/Fay/Walker instruction and would have argued to the jury that there was no evidence of "objectively menacing conduct that [would be] visible to the victims" of the noncontact offense of viewing child pornography.

The motion judge, who was not the trial judge,[15] denied the motion, finding that counsel's strategic choices were reasonable for two principal reasons. First, it was reasonable not to focus on the underlying offense of possessing child pornography

---

[15] The trial judge had retired.

because of the impact it could have on the jury. Second, if counsel had pressed the argument that the defendant's underlying crime was a noncontact offense, the photographs themselves might have come into evidence.

Discussion. 1. Ineffective assistance of counsel. "We review the denial of a motion for a new trial only to determine whether there has been a significant error of law or other abuse of discretion" (quotation omitted). Commonwealth v. Sullivan, 469 Mass. 621, 629 (2014). "To prevail on a motion for a new trial claiming ineffective assistance of counsel, a defendant must show that there has been a 'serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer,' and that counsel's poor performance 'likely deprived the defendant of an otherwise available, substantial ground of defence.'" Commonwealth v. Millien, 474 Mass. 417, 429-430 (2016), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).[16] "A strategic or tactical decision by

---

[16] We apply the prejudice standard articulated in ineffective assistance of counsel cases arising in the criminal context. See R.B., petitioner, 479 Mass. 712, 717-718 (2018) ("Given the fundamental liberty interest at stake in sexual dangerousness proceedings . . . we apply the same standard governing criminal cases"). See also Commonwealth v. George, 477 Mass. 331, 335 n.3 (2017). The Supreme Judicial Court has defined prejudice in ineffective assistance claims in civil cases as "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have

counsel will not be considered ineffective assistance unless that decision was 'manifestly unreasonable' when made." Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006), quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978).

Here, trial counsel's conduct, i.e., the failure to request an instruction in keeping with Suave, Fay, and Walker, fell measurably below what is expected of an ordinary fallible lawyer.  There was a significant body of evidence that the defendant had chosen to look at child pornography in order to avoid engaging in contact sex offenses.  Defense counsel was unfamiliar with the law, and agreed with the Commonwealth that G. L. c. 123A did not distinguish between contact and noncontact offenses when determining the likelihood of reoffense.  He did not ask the judge to define "menace," in the context of noncontact offenses, to mean conduct that would render a future victim reasonably apprehensive of a contact sex offense.[17]  "As a consequence, the [instruction] did not properly set forth each essential element" of the statute.  Commonwealth v. Loadholt,

---

been different" (quotation omitted).  Poe v. Sex Offender Registry Bd., 456 Mass. 801, 813 (2010).  Both standards are functionally the same.  See id. ("In declaring the term 'prejudice' better suited to noncriminal cases, our intent is not to change materially the second prong of the Saferian standard").  See also Doe, Sex Offender Registry Bd. No. 209081 v. Sex Offender Registry Bd., 478 Mass. 454, 460 n.10 (2017).

[17] As the motion judge found, counsel was an experienced lawyer who otherwise vigorously tried the case.

456 Mass. 411, 427, vacated on other grounds and remanded, 562 U.S. 956 (2010). Cf. Commonwealth v. Taranovsky, 93 Mass. App. Ct. 399, 405-407 (2018).

Here, there was no evidence at trial that the defendant created or produced child pornography, showed child pornography to any child, or used child pornography to entice, lure, approach, groom, or assault his victims. As a result of the erroneous instruction, the jury were repeatedly instructed that they could find the defendant to be a sexually dangerous person based solely on the possession of child pornography, facts which, on this record, do not support an SDP finding. See Walker, 467 Mass. at 1018. Although the judge relied on the model jury instruction, in the wake of Walker and Fay, and the evidentiary void at trial, defense counsel's failure to request an instruction regarding the legal definition of "menace" as applied to noncontact offenses cannot be characterized as a reasonable tactical decision. See Taranovsky, supra.

The motion judge concluded, and the Commonwealth argues, that trial counsel's "all or nothing" strategy was reasonable because, among other things, it was designed to avoid offending the jury by rejecting any suggestion that the defense was downplaying the seriousness of possession of child pornography.[18]

---

[18] The motion judge also concluded that defense counsel made a reasonable strategic decision because he would run the risk of

Passing on whether it would have been reasonable for defense counsel to pursue an all or nothing defense (had defense counsel been cognizant of the law), counsel's options were not mutually exclusive. He was free to argue one theory to the jury and "leave the discussion of the law to the judge." Commonwealth v. Callahan, 401 Mass. 627, 636 (1988). Moreover, whatever viability the all or nothing defense initially may have had, it eroded with the jury's first proposed question to the expert, asking if possession of child pornography means that a person is sexually dangerous. It further eroded when the Commonwealth rested without putting on evidence (other than a generalized reference to sexual deviancy) that the defendant would use child pornography in such a way as to place a future victim in reasonable apprehension of a contact sex offense. The all or nothing defense crumbled upon receipt of the pointed questions of the deliberating jurors, specifically asking if possession of child pornography alone could render the defendant a sexually

---

having the trial judge reconsider his decision to exclude the photographs themselves if counsel argued that the defendant might look at child pornography, but would not place any person in reasonable apprehension of a contact offense while doing so. It is unclear how the assertion of this defense would change the trial judge's calculus of the prejudicial impact of the photographs themselves, as opposed to testimony describing the photographs. Leaving that question to one side, the matter was resolved on a motion in limine before trial. The issue was capable of resolution in the same manner had Walker and Fay been raised, thereby obviating the risk.

dangerous person.  Counsel's failure to request an instruction defining "menace" in the context of noncontact offenses "withdr[ew] from the jury . . . consideration of the issue . . . , [and] left his client denuded of [that] defense" (quotation omitted).  Id.[19]

The Commonwealth also maintains that the noncontact offense of child pornography must be viewed differently from other noncontact offenses because, as the motion judge had observed, the preamble to G. L. c. 272, § 29C, provides, "[T]he mere possession or control of any sexually exploitative material results in continuing victimization of children as such material is a permanent record of an act or acts of sexual abuse or exploitation of a child and . . . each time such material is viewed the child is harmed."  St. 1997, c. 181, § 1.  The Commonwealth points to the harm caused to the victims of child pornography, who live with the knowledge that images of their abuse are in circulation and viewed by countless unknown individuals for purposes of deviant sexual gratification.

---

[19] The defendant also maintains that counsel was ineffective because he failed to correct the experts when they testified that there was no difference between contact and noncontact offenses in determining sexual dangerousness, and because he failed to argue the Walker, Fay issue in his opening statement and closing arguments.  We need not reach these issues in view of our disposition.

This case does not deal with the appropriate penalty for the crime of possession of child pornography, which is set by the Legislature. Rather, this case concerns the separate question whether possession of child pornography meets the statutory test for determining whether an offender is a sexually dangerous person who may be involuntarily civilly committed for a period of a day to life. See G. L. c. 123A, § 14 (d). In defining the contours of our SDP statute, the Supreme Judicial Court has been highly sensitive to the constitutional limitations on the civil commitment of individuals deemed sexually dangerous. See Fay, 467 Mass. at 583-586, citing, inter alia, Kansas v. Hendricks, 521 U.S. 346 (1997). As a result, the case law has developed to distinguish between "contact sex offenses," such as rape and indecent assault and battery, and "noncontact sex offenses," such as indecent exposure. For a person to be found an SDP based on noncontact sex offenses, the jury must be convinced that his predicted conduct places a future victim in "reasonable apprehension of being subjected to a contact sex crime." Suave, 460 Mass. at 588.

This requirement has also been applied to offenses involving children. See Fay, 467 Mass. at 585-586 ("[W]e do not need to define the outer contours of what either the Federal or Massachusetts Constitution would permit . . . . An individual

who is likely to engage in noncontact sexual offenses directed at children in a manner that would place them in reasonable apprehension of being the victim of a contact sexual offense plainly engages in conduct dangerous to their health, safety, and well-being.  Protecting children from exposure to such conduct . . . falls well within constitutional boundaries").  Although the possession of child pornography causes continued harm to the victim, we cannot say, as matter of law, that possession alone necessarily places that victim in reasonable apprehension of a future contact sex offense; it therefore does not, in and of itself, satisfy the definition of the statutory term "menace" as interpreted by the Supreme Judicial Court.  See Suave, 460 Mass. at 587-588.[20]

---

[20] We acknowledge that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."  Fay, 467 Mass. at 586, quoting New York v. Ferber, 458 U.S. 747, 757 (1982).  The parties have not cited, and we have not found, any authority holding that a defendant may be found to be an SDP solely based on viewing child pornography.  The Federal SDP statute requires the government to establish a likelihood of sexually violent conduct in the future.  The subsequent Federal cases rely on the use of child pornography as some evidence that the defendant will engage in "sexually violent conduct or child molestation if released."  United States v. Volungus, 730 F.3d 40, 46 (1st Cir. 2013), quoting the Adam Walsh Act, 18 U.S.C. §§ 4247(a)(5)-(6), 4248(d) (2006).  See Volungus, supra at 47-49.  State cases treat the possession of child pornography in a similar manner. See, e.g., In re Civil Commitment of Crosby, 824 N.W.2d 351, 359 (Minn. Ct. App. 2013); In re Detention of Thorell, 149 Wash. 2d 724, 759 (2003), cert. denied, 541 U.S. 990 (2004).

It remains to decide whether the defendant was prejudiced by counsel's error. "Prejudice in this context means that the defendant has likely been deprived of an 'available, substantial ground of defence.'" Millien, 474 Mass. at 430-431, quoting Saferian, 366 Mass. at 96. A defense is "'substantial' . . . where we have a serious doubt whether the jury verdict would have been the same had the defense been presented." Millien, supra at 432. Prejudice in this sense is equivalent to a determination that there has been a substantial risk of a miscarriage of justice. Id.

The jury returned a general verdict. The jury's questions suggest that they considered whether the noncontact offenses alone were sufficient to find the defendant a sexually dangerous person. A verdict based on a finding that the defendant likely would engage in a contact offense may be sustained, but for the reasons stated, a verdict based on a finding that the defendant was likely to possess child pornography, without more, would require reversal. Walker, 467 Mass. at 1018.

The evidence pointing to future contact offenses was sufficient, as discussed in part 2, infra, but not overwhelming. The defendant had not committed a contact offense in over two decades. The jury could have found that he was an untreated pedophile who would engage in contact offenses in the future if he could not rely on child pornography as an outlet, but the

jury were also permitted to find that he would continue to use child pornography in the future rather than engage in a contact offense, as he had for two decades. The Commonwealth's theory of the case was that either was enough. The prosecutor repeatedly argued that the defendant could be found an SDP based on any sexual offense, which the instructions defined to include the possession of child pornography alone.

"[W]here error pertains to the definition given to the jury of the crime charged, the possibility of a substantial risk of a miscarriage of justice is inherent" (quotation omitted). Commonwealth v. Stoltz, 73 Mass. App. Ct. 642, 644 (2009). See Taranovsky, 93 Mass. App. Ct. at 407. Similarly, when the instructional error pertains to the definition of "menace" given to the jury, we are left with a serious doubt whether the jury verdict would have been the same had the correct instruction been given, particularly where, as here, there was no evidence of a history of noncontact offenses that would put a future victim in reasonable apprehension of a contact sexual offense. On this basis, the defendant is entitled to a new trial.

2. Sufficiency of the evidence. The defendant maintains that the evidence was insufficient to prove beyond a reasonable doubt that he was a menace within the meaning of the statute. We review the evidence in the light most favorable to the

Commonwealth. See Commonwealth. v. Cahoon, 86 Mass. App. Ct. 266, 268 (2014).

The evidence supported a finding that the defendant is a "menace," as defined in Suave, based on the likelihood of committing a contact offense. The defendant admitted to committing contact sex offenses over a period of thirteen years, against nine different children. The defendant argues that he has not committed a contact offense in over twenty-two years and is therefore unlikely to commit one if released. However, "[t]he law is clear that the lapse of time [since the defendant's last contact sex offense], by itself, is not dispositive." Souza, petitioner, 87 Mass. App. Ct. 162, 171 (2015).

Moreover, the defendant admitted that he has used child pornography, claiming that its use as "therapy" has kept him from approaching children. In response to a question from the jury, Dr. Belle agreed that the defendant had "[no] other adequate coping skills or mechanisms." In addition, both Dr. Belle and Dr. Rouse-Weir testified that the viewing and collection of child pornography fueled the defendant's deviant arousal toward children. The jury were permitted to credit the experts' testimony. The jury also were permitted to credit Dr. Rouse-Weir's testimony that the defendant has demonstrated a longstanding deviant sexual interest in prepubescent boys and

girls that has continued into his early fifties, and Static-99R test results that indicated he has a moderate-high risk of reoffense.  The evidence was sufficient as to the likelihood of committing a contact sex offense in the future.

Conclusion.  The judgment is reversed, and the verdict is set aside.  The order denying the motion for new trial is reversed.

So ordered.